IN THE SUPREME COURT OF THE STATE OF DELAWARE

| IN RE TESLA MOTORS, INC. | § | |
|---|---|---|
| STOCKHOLDER LITIGATION | § | No. 181, 2022 |
| | § | |
| | § | Court Below: Court of Chancery |
| | § | of the State of Delaware |
| | § | |
| | § | C.A. No. 12711 |
| | § | |

Submitted: March 29, 2023
Decided: June 6, 2023

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices; and **WALLACE**, Judge, constituting the Court *en Banc*.[1]

Upon appeal from the Court of Chancery. **AFFIRMED**.

Jay W. Eisenhofer, Esquire, Christine M. Mackintosh, Esquire, Kelly L. Tucker, Esquire, Vivek Upadhya, Esquire, GRANT & EISENHOFER P.A., Wilmington, Delaware; Michael Hanrahan, Esquire (*argued*), Kevin H. Davenport, Esquire, Samuel L. Closic, Esquire, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware. *Of Counsel*: Daniel L. Berger, Esquire, GRANT & EISENHOFER P.A., New York, New York; Lee D. Rudy, Esquire, Eric L. Zagar, Esquire, Justice O. Reliford, Esquire, Matthew Benedict, Esquire, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; Randall J. Baron, Esquire, David T. Wissbroecker, Esquire, ROBBINS GELLAR RUDMAN & DOWD LLP, San Diego, California *for Plaintiffs-Below/Appellants.*

David E. Ross, Esquire, Garrett B. Moritz, Esquire, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware. *Of Counsel*: Evan R. Chesler, Esquire (*argued*), Daniel Slifkin, Esquire, Vanessa A. Lavely, Esquire, CRAVATH, SWAINE & MOORE LLP, New York, New York *for Defendant-Below/Appellee.*

Robert K. Beste, Esquire, SMITH KATZENSTEIN & JENKINS LLP, Wilmington, Delaware *for Amicus Curiae, Corporate Law Professors, in support of Appellants.*

**VALIHURA**, Justice:

---

[1] Justice Vaughn and Judge Wallace are sitting by designation under Del. Const. art. IV, §§ 38 & 12, respectively, and Supreme Court Rules 2(a) and 4(a) to complete the quorum.

*INTRODUCTION*

This is an appeal of an April 27, 2022, post-trial opinion by the Court of Chancery. At issue is the 2016 all-stock acquisition (the "Acquisition") of SolarCity Corporation ("SolarCity") by Tesla, Inc. ("Tesla"). In this suit, Tesla's stockholders claim that Elon Musk caused Tesla to overpay for SolarCity through his alleged domination and control of the Tesla board of directors (the "Tesla Board"). At trial, the foundational premise of their theory of liability was that SolarCity was insolvent at the time of the Acquisition. Because the Court of Chancery assumed, without deciding, that Musk was a controlling stockholder, it applied Delaware's most stringent standard of review: entire fairness.

The Court of Chancery found the Acquisition to be entirely fair. In this appeal, the two sides vigorously dispute various aspects of the trial court's legal analysis, including, primarily, the degree of importance the trial court placed on market evidence in determining whether the price Tesla paid was fair. Importantly, Appellants do not challenge any of the trial court's factual findings. Rather, they raise only a legal challenge, focused solely on the application of the entire fairness test. Much of Appellants' case on appeal asks that we re-weigh the evidence and come to different conclusions as to whether certain process flaws preponderated over the process strengths and whether the flaws in the process "infected" the price. We are convinced, after a thorough review of the extensive trial record, that the trial court's decision is supported by the evidence and that the court committed no reversible error in applying the entire fairness test.

Both Appellants and *amicus curiae* (the "*amici*") set forth a doomsday argument based upon their contention that the trial court grounded its entire fairness ruling almost

exclusively on the unaffected June 21, 2016 stock price of SolarCity, which they say was unreliable due to material, nonpublic information that was not factored into the June 21 stock price. *Amici* refer to the trial court's analysis as "market evidence run amok" and contend that, if affirmed, this case will disincentivize any board from utilizing the procedural protections this Court endorsed in *Kahn v. M & F Worldwide Corp.* ("*MFW*").[2] Although the trial court erred in this portion of its analysis, we reject the contention that the June 21 stock price was the sole basis of the trial court's fair price determination and that any error in that aspect of the analysis necessitates reversal. Other bases for the court's fair price determination are sufficient to support the opinion, particularly in the face of the total collapse of Appellants' insolvency theory — their only fair price theory at trial. Our decision to affirm is also driven, in part, by our deferential standard of review as to the numerous unchallenged credibility and factual findings underpinning the trial court's determination that certain process flaws did not predominate or cause the process either to be unfair or to infect the price.

On appeal, Appellants do not challenge the trial court's rejection of their insolvency theory. Instead, they now accuse the trial court of "rote reliance" on market price, applying a bifurcated entire fairness test, refusing to consider the trial experts' discounted cash flow ("DCF") analyses in determining fair price (even though they disclaimed reliance on this methodology at trial), and improperly relying on Evercore's "flawed" analyses and on the stockholder vote in support of its determination that the transaction was entirely fair. We

---

[2] 88 A.3d 635 (Del. 2014).

reject each of these challenges, and, for the reasons explained below, we AFFIRM the decision of the Court of Chancery.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. *The Parties*

Plaintiffs Below, Appellants are Arkansas Teachers Retirement System, Roofers Local 149 Pension Fund, Oklahoma Firefighters Pension and Retirement System, KBC Asset Management NV, Erste Asset Management GmbH, and Stitching Blue Sky Active Large Cap Equity Fund USA (collectively, "Appellants"). Appellants were Tesla stockholders and were selected by the Court of Chancery to serve as co-lead plaintiffs in the action below.

Defendant Below, Appellee Musk is a co-founder of Tesla, as well as its largest stockholder.[4] Musk "has continuously served as Tesla's CEO since October 2008" and "also served as the chairman of the Tesla Board from April 2004 to November 2018[.]"[5] As the Court of Chancery noted, "Tesla is 'highly dependent on [Musk's] services,' and [Musk's] departure from the company would likely 'disrupt [its] operations, delay the development and introduction of [its] vehicles and services, and negatively impact [its] business, prospects and operating results.'"[6]

---

[3] The facts, except as otherwise noted, are taken from the Court of Chancery's post-trial opinion below. *See In re Tesla Motors, Inc. S'holder Litig.*, 2022 WL 1237185 (Del. Ch. Apr. 27, 2022) ("*Trial Op.*").

[4] Musk "owned approximately 22% of Tesla's common stock at the time of the Acquisition." *Id.* at *1.

[5] *Id.* at *3.

[6] *Id.* (internal citation omitted).

Nominal defendant below, Tesla, is a publicly traded Delaware corporation that designs, develops, manufactures, and sells electric vehicles ("EVs") and energy storage products. It bills itself as "the world's only vertically integrated energy company, offering end-to-end clean energy products, including generation, storage and consumption."[7]

Non-party SolarCity was a publicly traded Delaware corporation founded in 2006 by Musk's cousins, Peter Rive and Lyndon Rive. SolarCity developed and produced solar panels for residential and commercial use. Musk was both the chairman of the SolarCity board of directors from 2006 until the Acquisition's closing in 2016 and its largest stockholder, holding approximately 21.9% of SolarCity's common stock.

Non-party Space Exploration Technologies Corporation ("SpaceX") "is a private aerospace manufacturer and space transport services company founded by [Musk] in 2002."[8] SpaceX bought $255 million in SolarCity corporate bonds — termed "Solar Bonds" — between March 2015 and March 2016.

The Tesla Board consisted of seven members: Musk, Kimbal Musk (Musk's brother), Brad Buss, Robyn Denholm, Ira Ehrenpreis, Antonio Gracias, and Stephen Jurvetson.[9] Although all seven Tesla Board members were named as defendants in this litigation, all except Musk settled all claims against them for $60 million, funded by insurance, which was approved by the Court of Chancery on August 17, 2020.

---

[7] B18 (Tesla, Inc. Form 10-K for fiscal year ended December 31, 2016 at 1).

[8] *Trial Op.*, 2022 WL 1237185, at *3.

[9] *See id.* at *4. We refer to the individual Tesla Board members by their last names and without honorifics. To avoid confusion with his brother, we use Kimbal Musk's first name. We intend no familiarity or disrespect.

5

According to the Appellants, all of Tesla's directors, except for Denholm, were conflicted in varying degrees with respect to the Acquisition.[10] Denholm had served on the Tesla Board since August 2014 and has served as the Tesla Board chair since November 2018. She served as the "Executive Vice President and Chief Financial Officer of Juniper Networks, Inc. from August 2007 to February 2016, as well as its Chief Operations Officer from July 2013 to February 2016."[11] Denholm has never held any financial interest in SolarCity, and Appellants do not challenge, on appeal, her disinterestedness or independence in the Acquisition.[12]

The other five Tesla Board members — apart from Musk and Denholm — were all conflicted to some degree, according to Appellants. Appellants alleged that Kimbal was conflicted because he is Musk's brother. Kimbal was also a SolarCity stockholder and had significant margin loans on his SolarCity shares at the time of the Acquisition. But Kimbal was not recused from either voting on or discussions regarding the Acquisition. Buss also had a connection to SolarCity: he served as SolarCity's Chief Financial Officer from 2014 until February 2016 — overlapping with his time on the Tesla Board. During negotiations regarding the Acquisition, approximately 45% of Buss's wealth was attributable to his

---

[10] *See id.* Rather than making factual findings as to each Tesla Board member's alleged conflicts, the trial court assumed that a majority of the Tesla Board was conflicted. "Whether by virtue of [Musk's] control, or by virtue of *irreconcilable board-level conflicts*, there is a basis for assuming that entire fairness is the governing standard of review." *Id.* at *30 (emphasis added) (internal citations omitted).

[11] A1140 (Joint Pre-Trial Order ¶ 70). Further, by "the time of the Acquisition, Denholm did not hold an officer or other management position with any company." *Id.* at ¶ 71.

[12] In its summary judgment opinion, the trial court noted that Appellants' "allegations that Denholm lacked independence are threadbare." *In re Tesla Motors, Inc. S'holder Litig.*, 2020 WL 553902, at *12 (Del. Ch. Feb. 4, 2020) ("*SJ Op.*").

relationship with Musk and Musk's companies. According to Tesla's public disclosures, Buss did not qualify as an independent director under the NASDAQ Listing Rules.

Ehrenpreis is the co-founder and co-managing partner of a venture capital fund, DBL Equity Fund-BAEF II, L.P. ("DBL"). DBL held 928,977 shares of SolarCity common stock at the time of the Acquisition, making it one of SolarCity's largest investors. Further, Ehrenpreis's co-founder at DBL is Nancy Pfund, who served on SolarCity's board and its special committee for the Acquisition.

Gracias, in addition to his role on the Tesla Board, served on SolarCity's board until the Acquisition's closing. He was recused from certain Tesla Board discussions regarding the Acquisition and from voting on the Acquisition. Finally, Jurvetson, like Ehrenpreis, was associated with a venture capital fund possessing ties to SolarCity. He was a managing director of Draper Fisher Jurvetson ("DFJ"), SolarCity's third-largest institutional stockholder, which held 4,827,000 shares as of the Acquisition.[13] Jurvetson personally owned 417,000 shares of common stock in SolarCity.[14]

B. *Tesla's Master Plan*

Although Tesla is known to many as an EV manufacturer, Musk has had a much broader vision for the company. In 2006, Musk authored the "Tesla Motors Master Plan" (the "Master Plan"), wherein he publicly declared that "Tesla's mission is to accelerate the world's transition to sustainable energy" and "to help expedite the move from a mine-and-

---

[13] *Trial Op.*, 2022 WL 1237185, at *5. One of Jurvetson's partners at DFJ served on SolarCity's board. *See id.* Jurvetson also served as a SpaceX director at the time of the Acquisition.

[14] Jurvetson testified at trial that this amounted to a single-day swing of his net worth. *See id.*

burn hydrocarbon economy towards a solar electric economy[.]"[15]  The Master Plan

contains three fundamental pillars upon which the transition to clean energy would rest:

"(1) sustainable energy generation from clean sources, such as solar power; (2) energy

storage in batteries; and (3) energy consumption through EVs."[16]

The three pillars are crucial to the Master Plan.  According to Musk, "[i]f any one

of those three parts are missing, then we will not have a sustainable energy future."[17]  The

Master Plan envisioned that SolarCity would be a part of a vertical integration[18] scheme

and a key to Tesla's vision for a renewable energy future.  The Master Plan states that Tesla

"will be offering a modestly sized and priced solar panel from SolarCity, a photovoltaics

company[.]"[19]

## C. Tesla Prior To The Acquisition

Tesla's main product line, initially, was its EVs.  In order to transition to the

---

[15] *Id.* at \*1 (internal quotation marks and citation omitted).  As the trial court summarized, the Tesla Board was familiar with and agreed upon the vision laid out in the Master Plan.  *See id.* at \*6 ("Tesla's directors uniformly testified that they understood from the outset that Tesla's long-term goal was to 'accelerate the world's transformation to an alternative energy future.'") (internal citation omitted).

[16] *Id.*

[17] A1378 (Elon Musk Trial Test. at 23:2–4) [hereinafter Musk Trial Test. at \_].

[18] Vertical integration is an economic concept.  "In a vertically integrated value chain, a single company combines two or more stages of production, such as basic research and further development of some technology, ordinarily performed by separate companies."  Peter Lee, *Innovation and the Firm: A New Synthesis*, 70 Stan. L. Rev. 1431, 1435 (2018).

Musk testified that vertical integration was a focus of his:  "I wanted [SolarCity] to be acquired so that we could do the product integration of the solar battery.  So rather than for them to spend a few months raising capital, it would have been better to do the acquisition and be able to move forward with the solar battery product that I felt was essential for a sustainable energy future."  A1433 (Musk Trial Test. at 241:13–20).

[19] A1378 (Musk Trial Test. at 23:17–19).

8

sustainable energy world, Tesla invested heavily in batteries for its EVs and energy storage products well before the Acquisition. To fully transform production output, Tesla decided to build its own company-operated factory to supply batteries. In February 2014, Tesla announced the construction of its "Gigafactory," a massive lithium-ion battery manufacturing factory that "was intended to produce more [lithium-ion] batteries … than the entire manufacturing battery production of every other manufacturing facility on the planet earth combined."[20]

With the Gigafactory's capacity for mass production came the opportunity for Tesla to bring the other core elements of the Master Plan to fruition, including the second pillar: energy storage. And with the Gigafactory, Tesla soon thereafter moved forward "with the design and production of solar energy storage products, including 'Powerwalls' designed to store solar energy for home use, and 'Powerpacks,' designed to store solar energy for commercial use."[21]

In March 2015, after the Tesla Board toured the Gigafactory, it discussed Tesla's long-stated goal of acquiring a solar company. A little over a month later, Tesla publicly launched Tesla Energy and debuted its Powerwall and Powerpack products. As the trial court noted, "Tesla set the stage for a combination of its battery storage capability with solar energy."[22] Musk himself confirmed Tesla's vision during the public launch of the Powerwall and Powerpack: "[T]he path that I've talked about, the solar panels and the

---

[20] *Trial Op.*, 2022 WL 1237185, at *7 (internal quotation marks and citation omitted).
[21] *Id.*
[22] *Id.* at *8.

9

batteries, it's the only path that I know that can do this. And I think it's something that we must do and we can do and that we will do."[23]

### D. SolarCity Prior To The Acquisition

#### 1. SolarCity's Business

Founded in 2006 by Musk's cousins, Peter and Lyndon Rive, SolarCity was an enterprise dedicated to the production and sale of solar panels for both residential and commercial use. It brought solar panels to the market through a variety of channels, from door-to-door sales to call centers to placements at Home Depot. To address the high cost of solar panels, SolarCity offered consumers a financing option, wherein SolarCity would pay the cost of installing and activating the solar panels in exchange for the customer's commitment to repay SolarCity incrementally, with interest, over a period of 20–30 years.

But entering the solar energy space required substantial capital. In order to maintain and expand its business model, SolarCity turned to capital raising to bridge the gap between its short-term costs and long-term cash flows. With a sophisticated capital markets team, SolarCity succeeded at raising capital. As the trial court noted, by 2016's end, SolarCity sponsored over 54 financing funds with 22 investors and carried substantial debt. The Solar Bonds, which SolarCity mainly sold to SpaceX and Musk, were another key component of the capital raising plan.

Despite being in a competitive — and rapidly developing — industry, SolarCity grew to be quite successful. By 2016, SolarCity "was the undisputed market share and cost

---

[23] *Id.* (internal quotation marks and citation omitted).

leader in the solar energy sector, with over 30% market share for U.S. residential solar, 22% market share for U.S. commercial solar, and 15% of total U.S. solar."[24] With respect to residential solar installations and revenues, SolarCity exceeded its two closest competitors combined.

### 2. *SolarCity's Financial Outlook*

By fall of 2015, massive capital outlays, debt maturities coming due, and lower-than-anticipated installations caused cash balances to drop. Management feared that the company would soon face "a major liquidity crisis[.]"[25] SolarCity needed to maintain an average monthly cash balance of approximately $116 million to remain compliant with its revolving debt facility's "Liquidity Covenant." A breach would trigger a default on SolarCity's revolver and cross-defaults on other debts. But management predicted that cash levels could fall to just $35 million, and SolarCity's war chest of cash — which was $1.1 billion in January 2015 — was expected to be just $200 million by 2015's end.

SolarCity decided to increase monetization to prevent further problems from arising due to its lack of cash. At a meeting of SolarCity executives in December 2015, Tanguy Serra, who served as SolarCity's President and CFO until just before the Acquisition's closing, pitched his idea of "cash equity" transactions to address the cash issue. These cash equity transactions involved selling a portion of the future cash flows from recurring customer payments to a third-party investor in exchange for an upfront payment. Serra

---

[24] *Id.* at \*11.

[25] *Id.* at \*10 (internal quotation marks and citation omitted).

intended the cash equity transactions to be part of a four-year plan.

The cash equity transaction idea proved successful, at least initially. The first cash equity transaction occurred with John Hancock Financial in May 2016, and two more transactions came in the second half of 2016. "SolarCity retained the rest of its future cash flows, which it estimated to be worth billions of dollars."[26] By the second quarter of 2016, SolarCity had accumulated what it estimated to be $2.2 billion (net present value or "NPV") in retained value.

But the cash equity transactions did not prove to be sustainable. Although SolarCity brought in more cash than it had previously, it still lacked the required capital to meet Serra's four-year plan. To address that problem, SolarCity's board decided to shift its focus to cash sales and began reducing costs. And SolarCity — which relied heavily on its ability to attract and raise capital — soon found its credit rating in jeopardy. At the start of 2016, the company's credit-rating was downgraded. Shortly thereafter, by the end of the first quarter of 2016, the company secured "$305 million in tax equity financing," an impressive sum, but far "short of the $940 million originally projected."[27]

Nevertheless, the trial court found that SolarCity was still a valuable company in 2016. It continued to raise billions of dollars from sophisticated financial institutions that had "deep access" to SolarCity's financials. Further, its cash challenges "were ramifications of rapid growth, not market disinterest in its products or poor business

---

[26] *Id.* at *10.

[27] *Id.* at *11.

12

execution."[28]

E. *Musk's Initial Pitch For The Acquisition*

It is against this backdrop of SolarCity's worsening cash problems that Musk first broached the subject of a deal between Tesla and SolarCity. In February 2016, Lyndon Rive[29] — Musk's cousin and co-founder of SolarCity — held an emergency meeting to discuss SolarCity's growing need for cash. Musk attended. At this meeting, management discussed various measures to stop the bleeding, such as ranking accounts payable to modulate costs and developing guidelines to suspend certain installations based on their cash impact. Once the meeting ended, Musk and Lyndon discussed Tesla potentially acquiring SolarCity.

In advance of a special Tesla Board meeting scheduled for February 29, 2016, Musk asked Tesla's CFO, Jason Wheeler, to prepare a financial analysis of a Tesla/SolarCity merger and give a presentation at the meeting. At the meeting, Wheeler gave his presentation on a potential merger between the two companies, noting that SolarCity's stock historically traded at a low price. The Tesla Board, notwithstanding Musk's strong endorsement, did not approve moving forward on a potential merger and instead renewed its focus on getting Tesla's EV production up-and-running, particularly the Tesla Model X. However, the Tesla Board did authorize management to gather additional details and to further explore and analyze a potential transaction with SolarCity or other related

---

[28] *Id.*

[29] We refer to Lyndon Rive by his first name to avoid confusion with his brother, Peter Rive. No disrespect or familiarity is intended.

businesses.

The Tesla Board next met in March 2016 and again discussed the possibility of Tesla acquiring SolarCity. And again, it declined to proceed further with an acquisition, but — as in the February 2016 meeting — the Tesla Board reiterated that the topic be postponed to a later date. The Tesla Board and management did discuss the steps required should the Tesla Board decide to move forward with negotiations in the future. One such step involved retaining Wachtell, Lipton, Rosen & Katz ("Wachtell") to advise the Tesla Board regarding a potential transaction.

## F. SolarCity's Worsening Financial Outlook

Amidst the backdrop of Musk's overtures to the Tesla Board regarding a potential transaction, SolarCity's cash flows continued to decline. The company reported $32 million in net negative cash flow by the end of 2016's first quarter. Negative cash flow was projected for the second quarter to be over $139 million before turning positive in the latter half of the year. To address these concerns, Musk tasked Lyndon with managing SolarCity's financial position until May 2016, a time when Musk wanted to revisit deal discussions.[30] Lyndon discussed SolarCity's financial state at an April 26, 2016 SolarCity board meeting. SolarCity anticipated substantially fewer installations than forecasted and ran the risk of tripping its Liquidity Covenant. The problems spilled over throughout SolarCity's enterprise, and the company soon found itself battling employee turnover, especially in its sales department, which was crucial to getting its solar panels out to

---

[30] *See Trial Op.*, 2022 WL 1237185, at *13.

14

consumers. As of June 30, 2016, total cash on hand equaled $145.7 million — less than $30 million above the Liquidity Covenant.

In a call between Lyndon and Musk in May 2016, Lyndon conveyed that he wanted to move forward with a potential merger between the two companies. In response, Musk told Lyndon that any negotiations would have to be pushed to June. It was then that Lyndon expressed the desire that a bridge loan accompany any offer or else SolarCity would have to put off any transaction to raise equity. Musk replied that any Tesla acquisition proposal would come with a bridge loan to SolarCity.

## G. The Acquisition's Negotiation Process

### 1. Tesla Retains Independent Advisors

As noted, in March 2016, the Tesla Board retained Wachtell as deal counsel.[31] The Tesla Board later retained Evercore Partners ("Evercore"), a leading investment bank, as its financial advisor for the potential merger. Although Musk was involved in the retention of Wachtell, he was not involved in retaining Evercore.[32]

Musk again raised the possibility of a deal with SolarCity to the Tesla Board on

---

[31] *See supra* Section I.E. Musk was involved — with assistance from Gracias and Tesla's general counsel — in retaining Wachtell "before the Tesla Board had decided it wanted to pursue a transaction" with SolarCity. *Trial Op.*, 2022 WL 1237185, at *13 n.169.

[32] *See id.* at *15. The trial court found that "Tesla selected independent, top-tier advisors to represent the Tesla Board in the Acquisition (Wachtell and Evercore)." *Id.* at *36. Regarding Wachtell, the Vice Chancellor noted that Appellants "did not demonstrate a longstanding relationship or conflict between [Musk] or Tesla and Wachtell. To the contrary, based on the evidence, I am satisfied that Wachtell was an independent and effective advisor to the Tesla Board." *Id.* at *13 n.169. For this reason, the Vice Chancellor found that "the failure to disclose the circumstances or timing of Wachtell's engagement in the Proxy was immaterial." *Id.* Likewise, "Evercore had not previously worked for Tesla or SolarCity." *Id.* at *15.

May 31, 2016.  The Tesla Board thought the timing was now right for an acquisition because the company had addressed the problems with the Model X rollout.  Once the Tesla Board determined to move forward with an acquisition of SolarCity, it was determined that both Musk and Gracias should be recused from any vote relating to the transaction.  Recusal was deemed necessary as both had served on the SolarCity board, presenting a clear conflict of interest.  Although Musk and Gracias were recused from any voting, the Tesla Board determined that they could still participate in certain meetings and high-level strategic discussions regarding the Acquisition, as their experience and knowledge of the solar industry and of SolarCity's business operations was viewed as helpful.[33]

On June 20, 2016, the Tesla Board had another special meeting.  Evercore presented an overview of various potential solar acquisition targets[34] and indicated that, among Tesla's options for a strategic merger, SolarCity represented the best option.  SolarCity's financial condition was discussed during the meeting, including the company's ability to

---

[33] *See id.*  The definitive proxy statement (the "Definitive Proxy") informed Tesla and SolarCity stockholders that:

> [T]he Tesla Board determined that *the strategic vision, expertise and perspectives* of Messrs. Elon Musk and Antonio Gracias would continue to be helpful to the Tesla Board's *evaluation of a potential acquisition of a solar energy company because of their involvement in the solar industry*, but that Messrs. Elon Musk and Antonio Gracias, as a result of their service on the SolarCity Board, should recuse themselves from any vote by the Tesla Board on matters relating to a potential acquisition of SolarCity, including evaluation, negotiation and approval of the economic terms of any such acquisition.

AR501 (Definitive Proxy at 59) (emphases added).

[34] *See* AR3–108 (Evercore Presentation).

16

meet its current and future obligations. Evercore advised the Tesla Board that the market favored a stock-for-stock transaction between the companies. The Tesla Board focused on the strategic rationale for the transaction and recognized the potential benefits, including the "significant synergies" a solar acquisition would bring to the table.

Musk, who attended the June 20 meeting, "noted that the price had to be 'publicly defensible,' meaning 'in the middle … of precedent premia paid.'"[35] During this initial presentation by Evercore, Musk "appear[ed] to have proposed a 30% premium over SolarCity stock's 4-week trailing price, which amounted to $28.50 per share."[36] Evercore recognized the need to pay a premium and recommended a stock exchange ratio equating to a $25–$27 per share offer.[37] The Tesla Board, by contrast, discussed a range of 0.122 to 0.131 Tesla shares per SolarCity share, equating to $26.50–$28.50 per SolarCity share. As the trial court noted, Musk was not keen on a range of exchange ratios. Denholm — who led Tesla's negotiations — preferred to use ranges because she felt they played a role in negotiating, including providing flexibility. Musk and Gracias then left the meeting, and the Tesla Board continued to discuss the potential acquisition.

### 2. Tesla's Initial Offer

In Musk's and Gracias' absence, the Tesla Board approved a preliminary,

---

[35] See Trial Op., 2022 WL 1237185, at *15 (internal citation omitted).

[36] Id. at *16.

[37] Later, at trial, Courtney McBean — Evercore's lead banker — testified that "Solar City was [] a high-growth company" and "the market leader." A1689 (Courtney C. McBean Trial Test. at 1454:20–22) [hereinafter McBean Trial Test. at _]. She explained that "in order to get shareholder approval from the SolarCity stockholders, we believed that we would need to pay a premium." Id. (McBean Trial Test. at 1454:23–1455:1).

17

nonbinding proposal to acquire SolarCity, subject to due diligence. On June 20, 2016, Tesla made an offer to acquire SolarCity at an exchange ratio approved by the Tesla Board of 0.122 to 0.131 shares of Tesla stock per share of SolarCity stock (the "Initial Offer"). This equated to a 21% to 30% premium over SolarCity's trading price at the time.

Included in the Initial Offer was a common deal feature: a majority-of-the-minority voting provision. This provision conditioned the Acquisition on the approval of a majority of disinterested SolarCity stockholders and Tesla stockholders voting on the transaction. A second common deal feature was not employed: the formation of a special, independent negotiating committee of the Tesla Board. As the trial court noted, the Tesla Board opted not to form a special committee "for reasons unexplained."[38] Another aspect from the early discussions regarding the potential Acquisition, however, did not make its way into the Initial Offer. Despite Musk's request, the Tesla Board and Evercore concluded that a bridge loan would not be in Tesla's best interest, and so it was not included in the Initial Offer.

The Initial Offer was publicly announced the next day, June 21, 2016, following the market's close. Reactions to the Initial Offer were swift. The price of Tesla's stock fell "more than 10%, or $3.07 billion—an amount greater than SolarCity's entire market capitalization."[39] Although Tesla's stock price ultimately rebounded and rose above the

---

[38] *Trial Op.*, 2022 WL 1237185, at *34. Appellants did not ask Musk, during his two depositions or two days of trial testimony, any questions regarding the creation of a Tesla special committee. *See id.* at *34 n.408. Accordingly, the trial court refused to "surmise that the failure to form a special committee was somehow [Musk's] doing" since there was no evidence to that effect. *Id.*

[39] *Id.* at *16. On June 22, 2016, Tesla's stock closed at $196.66 from the prior day's close of $219.61. *See* A1182 (Joint Pre-Trial Order).

18

unaffected price by mid-July, it was clear that the market had a gut reaction to the Acquisition. SolarCity, for its part, fared no better following the Initial Offer's public announcement. Its credit rating was downgraded, and it finished the second quarter with approximately $216 million in negative cash flow. Despite these problems, Bank of America continued to lend to, and even deepen its ties with, SolarCity. As the trial court found, SolarCity's financing counterparties participated in financing transactions with Solar City in excess of $3 billion from the fourth quarter of 2015 through the fourth quarter of 2016 — a timeframe when Appellants asserted SolarCity was insolvent.

Upon receipt of the Initial Offer from Tesla, SolarCity formed a special committee (the "SolarCity Committee") of two directors: Nancy Pfund and Don Kendall. The SolarCity Committee retained Lazard Ltd. ("Lazard") as its financial advisor for the Acquisition. Lazard expressed concerns that the company teetered on the edge of breaching the Liquidity Covenant and would be operating with little margin of error until October 2016.

### 3. Tesla's Negotiation Strategy

Denholm, whom the Vice Chancellor described as "an extraordinarily credible witness," led negotiations for Tesla.[40] As noted above, however, Tesla did not form a special committee of the Tesla Board, instead choosing to vest negotiating power in Denholm.[41] The trial court found Denholm's mastery over the negotiations to be critical.

---

[40] *Trial Op.*, 2022 WL 1237185, at *17 n.233.

[41] The trial court commented on Denholm's credibility when weighing her role in the Acquisition. "If [Denholm] says she was in charge, then she was in charge." *Id.*

19

She spent almost six weeks and hundreds of hours on the Acquisition. It was Denholm who corresponded with the SolarCity Committee, assisted by Evercore, updated the Tesla Board, and led the exchange of offers and counteroffers.

Denholm also fleshed out the details and diligence of the Acquisition. Evercore and Wachtell assisted her and the Tesla Board during the negotiations. Evercore staffed the matter with a team of ten bankers, who reviewed SolarCity's financial condition, conducted valuation analyses, and negotiated with the Lazard team.

During this time, Musk kept abreast of the negotiation strategy, and Lyndon kept Musk apprised of SolarCity's financials and the need for bridge financing. The Tesla Board and Evercore, however, remained opposed to a bridge loan, despite Musk having earlier pushed for one. In response to an email request from Lyndon on July 10 to speak with Musk about a bridge loan, Musk advised Lyndon that, despite Musk's wishes, the Tesla Board would not authorize a bridge loan.

4. *Tesla's Advisors Uncover SolarCity's Financial Issues*

Evercore's diligence process was deliberate and encompassing. Evercore's lead banker on the deal, Courtney McBean, led her team's investigation and analysis of SolarCity's financial state. One core component of Evercore's diligence included discussions with the Lazard team on the SolarCity side. During a call on July 15, 2016, Lazard advised Evercore that it was unaware that SolarCity was at risk of breaching the Liquidity Covenant. Following Evercore's discovery of Lazard's failure to comprehend the financial risk SolarCity faced, McBean called Musk. Musk was surprised that Lazard did not appreciate the risk of tripping the Liquidity Covenant.

20

Following his discussion with Evercore's McBean, Musk turned his focus to the status of diligence. To increase the pace, he set up daily meetings with Evercore, but as the trial court found, "[i]t is not clear from the record if [Musk's] meetings with Evercore came at the suggestion of the Tesla Board."[42] The first of these calls between Musk and Evercore occurred on July 16, 2016 — one day after Evercore's concerning call with Lazard — and mainly focused on Evercore's workflows. Following this call, Evercore accelerated its pace, with McBean telling her team that the deal would likely be finalized within days.

SolarCity's financial issues became the focus of Evercore's work in the days following those two July calls. Evercore created "downside" projections on SolarCity and the Acquisition. Those projections were presented to Evercore's Fairness Committee, which proposed some changes. At the Tesla Board meeting on July 19, 2016, Evercore explained to the Tesla Board that SolarCity could trip its Liquidity Covenant by July 30, 2016 and warned of the financial consequences. These facts led Evercore to recommend that the Tesla Board lower its offer from the terms of the Initial Offer. That recommendation was first made to Musk in a call with Evercore on July 21, 2016, and then to the Tesla Board on July 22.

Right after the Tesla Board meeting on July 19, Musk self-published the second phase of the Master Plan, which he entitled the "Master Plan Part Deux."[43] As Musk

---

[42] *Id.* at *18.

[43] *See id.* at *19.

testified, the impetus behind the Master Plan Part Deux "was to remind people of the purpose of the company, which was to accelerate the advent of sustainable energy."[44] As the trial court found, Musk "stated that 'the time has come' for Tesla to acquire SolarCity and 'sell integrated solar and energy storage systems.'"[45] Publishing the Master Plan Part Deux was Musk's way of directly communicating with Tesla stockholders that Tesla's vision for the future could not be achieved without a solar company.

The Tesla Board next met again on July 24 to discuss Evercore's July 19 presentation and its recommendation that the Tesla Board lower its offer. Musk attended. He echoed Evercore's message that SolarCity's financial condition warranted a lower deal price, but he stressed that the Acquisition still made strategic sense. Once Musk conveyed his thoughts to the Tesla Board, he left the meeting.[46] Evercore presented next and gave an updated presentation on its valuation of SolarCity, confirming its recommendation that the Tesla Board lower its offer. The question, then, became one of timing: the Tesla Board discussed whether to submit a revised offer to SolarCity before SolarCity released its second quarter results. Doing so could lower SolarCity's stock price. After discussion, the Tesla Board determined to make a revised proposal at a lower price prior to SolarCity's announcement of its second quarter results. The new exchange ratio was 0.105 shares of Tesla stock per SolarCity share.

---

[44] A1393 (Musk Trial Test. at 84:6–8).

[45] *Trial Op.*, 2022 WL 1237185, at *19 (internal citation omitted).

[46] Gracias — who, like Musk, was recused from any potential vote — left the room, as well.

## H. *The Acquisition's Terms And Public Announcement*

In the days following the Tesla Board's July 24 meeting, negotiations continued as the two sides hashed out the details of the Acquisition. The final terms were proposed by the Tesla Board and then conveyed to the SolarCity Committee on July 30 (the "Final Offer"). Tesla offered 0.110 shares of Tesla stock per share of SolarCity stock — significantly below the Initial Offer's range of 0.122 to 0.131 shares. Evercore presented its fairness opinion to the Tesla Board on July 30, 2016, opining that the Final Offer was fair, from a financial point of view, to Tesla. "[T]he Acquisition price fell within or below each of the seven stock price ranges Evercore presented to the Tesla Board (plus two illustrative reference ranges)."[47] Neither Musk nor Gracias took part in the Tesla Board vote on the Final Offer.

On July 31, 2016, Tesla and SolarCity executed an Agreement and Plan of Merger (the "Merger Agreement"), that was announced publicly on August 1. The Merger Agreement required SolarCity to receive Tesla's approval before issuing any equity or taking on any new debt. It also required SolarCity to remain in compliance with its debt covenants pending closing. Tesla then filed a Form 8-K with the U.S. Securities and Exchange Commission (the "SEC"), with the Form 8-K disclosing that the Acquisition's exchange ratio represented an equity value for SolarCity of approximately $2.6 billion, or $25.37 per share, based on a five-day volume-weighted average of Tesla's trading price as of July 29, 2016. The final Acquisition consideration — 0.110 Tesla shares for each share

---

[47] *Trial Op.*, 2022 WL 1237185, at *21.

23

of SolarCity stock — resulted in Tesla paying an equity value of $20.35 per share of SolarCity common stock or approximately $2.1 billion at closing.

Signing the Merger Agreement did not ameliorate SolarCity's financial difficulties. Real risk remained of a Liquidity Covenant breach before the parties could close on the Acquisition. Pressed for cash, SolarCity turned to bond offerings. Musk and his cousins, Peter and Lyndon Rive, purchased $100 million of 12-month 6.5% Solar Bonds, which solved SolarCity's short-term cash needs. Other options to raise capital were not on the table due, in part, to constraints imposed by the Merger Agreement's ordinary course covenant.

I. *The Tesla Stockholder Vote*

On August 31, 2016, Tesla filed with the SEC a preliminary proxy statement, which contained an explanation of the Acquisition's strategic rationale, the deal process, estimated synergies, fairness opinions and the valuation methodologies of Lazard and Evercore.[48] As the Vice Chancellor explained, it:

> [D]isclosed three sets of SolarCity financial projections to the Tesla stockholders: (1) the SolarCity Base Case: the base case reflecting the best view of SolarCity's management on the company's future as of 2016; (2) the Evercore Sensitivity Case: the sensitivity case prepared by Evercore and Tesla by adjusting the SolarCity Base Case to "reduce[] SolarCity's projected capital needs;" and (3) the Lazard Sensitivity Case: the sensitivity case prepared by Lazard and SolarCity that assumed SolarCity faced challenges accessing the capital markets and with borrowing costs.[49]

Evercore's initial fairness analyses were based on the SolarCity Base Case and Evercore

---

[48] *See id.* at *22.

[49] *Id.* (internal citations omitted).

24

Sensitivity Case because the Lazard Sensitivity Case had not yet been provided to Tesla or Evercore.

Evercore reran its cash flow analysis upon learning that Lazard had developed a downside case.[50] "Evercore determined that the Evercore Sensitivity Case was more conservative than the Lazard Sensitivity Case, which generated uniformly higher values for SolarCity."[51] Lazard's SolarCity cash flow analysis, for example, began at $6 million and topped off at $801 million. Evercore's analysis, however, was more cautious, with Evercore's SolarCity cash flow analysis ranging from negative $226 million to $437 million.[52] As Evercore's lead banker, Courtney McBean, testified, "given that [Lazard's model] generates so much more cash, it's pretty clear that it's less conservative."[53] Evercore then presented its conclusions about the SolarCity–Lazard sensitivity model.

On October 12, 2016, Tesla and SolarCity filed the Definitive Proxy with the SEC.[54] Reaction to the Acquisition came from many sources. Institutional stockholders formed

---

[50] Evercore was not aware that Lazard planned to run a sensitivity case and only learned of its existence once the Evercore team reviewed the preliminary proxy statement. *See* A1690 (McBean Trial Test. at 1458:5–15).

[51] *Trial Op.*, 2022 WL 1237185, at *22. The SolarCity Base Case is referred to in the Definitive Proxy as the "Unrestricted Liquidity Case." The Evercore Sensitivity Case is referred to in the Definitive Proxy as the "Revised Sensitivity Forecasts." This case was prepared by Evercore and Tesla by adjusting the SolarCity Base Case to reduce SolarCity's projected capital needs. The Lazard Sensitivity Case is referred to in the Definitive Proxy as the "Liquidity Management Case." It was prepared by Lazard and SolarCity and assumed SolarCity faced challenges accessing the capital markets and with borrowing costs.

[52] *See* A1691 (McBean Trial Test. at 1462:5–10).

[53] *Id.* (McBean Trial Test. at 1463:24–1464:2).

[54] *See* AR434 (Definitive Proxy).

the base of Tesla's stockholder franchise,[55] and many had mixed-to-hesitant reactions to the Acquisition. The two main proxy advisory firms, Institutional Shareholder Services ("ISS") and Glass, Lewis & Co. ("Glass Lewis"), both offered recommendations on the Acquisition in advance of the vote. ISS recommended that stockholders vote in favor of the Acquisition and noted that it helped strengthen Tesla's goal of becoming a fully integrated energy company. Glass Lewis, on the other hand, advocated against the Acquisition, calling it a "thinly veiled bail-out plan" and expressing the view that SolarCity was "increasingly and materially incapable of supporting itself."[56]

To quell the concerns of the institutional investors, Musk decided that a demonstration of a product in development at SolarCity — the Solar Roof — would show investors the promise of the Acquisition.[57] He involved himself in the pitches to the market, especially when it came to the product demonstrations. He demonstrated the Solar Roof in a joint Tesla/SolarCity presentation on October 28, 2016, showcasing a future combination of the Solar Roof, solar storage through the Powerwall, and Tesla EVs powered by solar.

The stockholder vote came a few weeks later, on November 17, 2016. The results

---

[55] For example, as of September 30, 2016, 11 institutional investors each held 1% or more of Tesla's stock. This list includes many well-known institutional investors: from Fidelity and Blackrock to T. Rowe Price and Vanguard. *See* A483 (Daniel R. Fischel Expert Report at Exhibit D).

[56] *Trial Op.*, 2022 WL 1237185, at *23 (internal quotation marks and citation omitted).

[57] At his deposition, Musk testified: "[I]t stands to reason that if you are trying to explain to investors why the combination makes sense, then you have to explain the products and the synergies that will result from the -- from the combination. Otherwise, they will not understand why it should be done." A339 (Elon Musk Dep. Trans. at 421:15–20).

were overwhelming, with roughly 85% of the votes cast by Tesla's stockholders voting in favor of the Acquisition. Most of those votes were cast by sophisticated, institutional investors.

*J. The Closing*

On November 21, 2016, the Acquisition closed. By the time "of closing, SolarCity brought substantial value to Tesla. It had 15,000 employees, $200 million a month in business, over $3 billion in future cash flows, over 300,000 customers, and net assets in excess of its market capitalization (as confirmed by KPMG)[.]"[58] As the trial court found, this led to "Tesla booking an $89 million gain on the Acquisition" and that "as of closing, SolarCity had accumulated and continued to accumulate substantial net retained value."[59]

After the closing, however, Tesla faced more challenges at the start of 2017. The time had come for Tesla to launch its first full-scale production EV — the Model 3. But production delays hampered the Model 3 roll-out and, with much on the line, Musk directed all of Tesla's focus, post-Acquisition, toward the Model 3 launch. This shift in focus included redeploying former SolarCity employees who had been transitioned into Tesla's workforce. As a result, the solar energy business was put on hold, and Tesla even started to outsource production and installation of solar panels to third parties. Despite that, Tesla largely achieved the vision Musk outlined in the Master Plan.[60] As the trial court observed, "[a]s long-promised, following the Acquisition, Tesla became the world's first vertically

---

[58] *Trial Op.*, 2022 WL 1237185, at *24 (internal citations omitted).

[59] *Id.*

[60] *See id.* at *25.

27

integrated sustainable energy company, offering end-to-end clean energy products."[61]  The

court found that "[t]he preponderance of the evidence suggests that the Acquisition was

and is synergistic."[62]  It also found that Tesla realized approximately $1 billion in nominal

cash flows and conservatively expected to realize at least $2 billion more from the legacy

SolarCity systems.  Tesla also achieved significant cost and revenue synergies.

### K.  Proceedings In The Court Of Chancery

Litigation began in the fall of 2016, when several Tesla stockholders filed separate

actions challenging the Acquisition.  The Court of Chancery consolidated the actions in

mid-October 2016 and appointed lead plaintiffs and counsel.

### 1.  Pre-Trial Motions Practice

On March 28, 2018, the trial court denied the then-Defendants' motion to dismiss.[63]

The then-Defendants had moved to dismiss under *Corwin v. KKR Financial Holdings

LLC*,[64] and then-Plaintiffs, now-Appellants, opposed, arguing that Musk was Tesla's

controlling stockholder and, thus, *Corwin* did not apply.  The trial court agreed with

Appellants and noted that, although it was "a close call," it was reasonably conceivable

that Musk, a minority blockholder, was Tesla's controlling stockholder and exerted control

over the Tesla Board in connection with the Acquisition.[65]  The Court of Chancery

---

[61] *Id.* (internal quotation marks and citation omitted).

[62] *Id.* at *25.

[63] *See In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293 (Del. Ch. Mar. 28, 2018) ("*MTD Op.*").

[64] 125 A.3d 304 (Del. 2015).

[65] *MTD Op.*, 2018 WL 1560293, at *1.

summarized its pleadings-stage assessment of Musk's status as Tesla's alleged controller

as follows:

> Whether Musk has regularly exercised control over Tesla's Board, or whether he did so only with respect to the Acquisition, is not entirely clear from the Complaint. For purposes of my decision on the motion, however, that distinction does not matter. At the very least, the Complaint pleads sufficient facts to support a reasonable inference that Musk exercised his influence as a controlling stockholder with respect to the Acquisition. Specifically, the combination of well-pled facts relating to Musk's voting influence, his domination of the Board during the process leading up to the Acquisition against the backdrop of his extraordinary influence within the Company generally, the Board level conflicts that diminished the Board's resistance to Musk's influence, and the Company's and Musk's own acknowledgements of his outsized influence, all told, satisfy Plaintiffs' burden to plead that Musk's status as a Tesla controlling stockholder is reasonably conceivable.[66]

Thus, the court provisionally established entire fairness as the standard of review.[67]

Both sides then moved for summary judgment, and the trial court denied summary

judgment with limited exceptions not relevant to the issues presented on appeal.[68] Because

genuine disputes of material fact existed as to whether Musk was Tesla's controlling

stockholder, whether the stockholder vote was fully informed, whether a majority of

---

[66] *Id.* at *19. The then-Defendants sought an interlocutory appeal of the Court of Chancery's opinion denying their motion to dismiss. We refused the interlocutory appeal. *See Musk v. Ark. Teacher Ret. Sys.*, 184 A.3d 1292, 2018 WL 2072822 (Del. May 3, 2018) (ORDER).

[67] *See MTD Op.*, 2018 WL 1560293, at *19 (noting that "[t]he facts developed in discovery may well demonstrate otherwise") (internal citation omitted). As the Court of Chancery emphasized in its order denying certification of the interlocutory appeal, the standard of review remained to be determined. *See In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 2006678, at *3 (Del. Ch. Apr. 27, 2018) ("As the Opinion makes clear, the standard of review remains to be determined.") (internal citation omitted).

[68] *See SJ Op.*, 2020 WL 553902. The only claims that the court dismissed on summary judgment were "certain disclosure claims that [were] not viable, either a matter of undisputed fact or as a matter of law." *Id.* at *2.

Tesla's Board faced disqualifying conflicts of interest, and whether the Acquisition constituted waste, the court set the case for trial and noted that the then-Defendants could "avoid liability if the transaction was fair."[69]

Shortly before the court's summary judgment decision, the litigants reached a settlement to dismiss the claims against all of the then-Defendants, save Musk. On August 17, 2020, the trial court approved the partial settlement, for an aggregate of $60 million (funded by insurance), as to those then-Defendants. The trial court then assumed then-Plaintiffs, now-Appellants' "best case on standard of review—that entire fairness applies—and consider[ed] the trial evidence through that lens."[70]

*2. Trial Testimony*

The trial commenced in July 2021 and spanned ten days of in-person testimony and one day of remote testimony. The witness list was expansive: 11 live fact witnesses (and one by deposition video) and 7 live expert witnesses testified at trial. Musk testified first.[71]

As is common in an entire fairness trial, both sides put forward expert testimony opining on the Acquisition.[72] Appellants presented three experts: Ronald Quintero, Murray Beach, and Jeurgen Moessner.[73] A common theme emerged from Appellants'

---

[69] *Id.* at *7.

[70] *Trial Op.*, 2022 WL 1237185, at *27.

[71] *See* A1374–440 (Musk Trial Test.).

[72] *See S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*, 2011 WL 863007, at *17 (Del. Ch. Mar. 9, 2011) ("As has become common in entire fairness proceedings of this sort, the parties presented the testimony of competing valuation experts in an effort to convince [the Court of Chancery] that their valuation was the most accurate."), *aff'd*, 35 A.3d 419 (Del. 2011) (ORDER).

[73] *See Trial Op.*, 2022 WL 1237185, at *6. Quintero founded two firms: R.G. Quintero & Co., which focuses on accounting, and Chartered Capital Advisers, Inc., which focuses on financial

presentation:  insolvency.  As the trial court put it, Appellants were "all in" on the theory that SolarCity was insolvent, and, thus, Tesla overpaid.[74]  Quintero's testimony was key, and "he doubled down on his sworn testimony that SolarCity was worth nothing."[75] Appellants "placed their valuation case entirely in Quintero's hands, and Quintero, in turn, relied exclusively on a single valuation theory:  insolvency."[76]  Further, Appellants' "other experts did not opine on valuation."[77]

Musk presented four experts:  Dan Reicher, Jonathan Foster, Frederick Van Zijl,

---

services for M&A transactions.  *See* A583 (Ronald G. Quintero Expert Report at 2) [hereinafter Quintero Rep. at _].  He was retained "to evaluate the ability of SolarCity to meet its financial obligations absent the acquisition and also to determine the fair value of SolarCity common stock as of the merger date."  A1504 (Ronald G. Quintero Trial Test. at 695:2–5) [hereinafter Quintero Trial Test. at _].

Beach is the president of Business Consulting Group, LLC.  *See* A2218 (Beach Demonstrative Exhibits).  He was retained "to determine if a seasoned equity offering [] would be possible" for SolarCity and if a raise between $250–$300 million would have been feasible.  A1633 (Murray Beach Trial Test. at 1078:18–22).

Moessner founded Global Capital Finance, a firm specializing in the renewable energy sector.  He was retained "to assess the reasonableness of the projections that were used by the Tesla board in order to determine whether or not to pursue the merger" and "to determine whether or not it was necessary to make any adjustments to those projections in order to address the operative reality and the business situation of SolarCity at the time of the merger."  A1483 (Jeurgen Moessner Trial Test. at 609:14–21) [hereinafter Moessner Trial Test. at _].

[74] *See Trial Op.*, 2022 WL 1237185, at *40.

[75] *Id.*

[76] *Id.* (internal citations omitted).

[77] *Id.* at *40 n.470.  Their other two experts offered similar testimony regarding SolarCity's financial state, which they depicted as dire.  According to Beach, SolarCity could not succeed on an equity offering, putting its ability to finance itself in question.  According to Moessner, the projections by Evercore and Lazard valuing SolarCity were inflated and too optimistic.  *See id.* at *6.

and Daniel Fischel.[78]   Musk's experts discussed the strategic rationale behind the Acquisition.   They focused their testimony on the Master Plan and the potential for synergistic value to catapult Tesla to the next level.   Reicher's testimony focused on the potential synergies of the Acquisition and the benefits that would flow to Tesla stockholders.   Foster testified as to the process employed by the Tesla Board that culminated in the Acquisition.   Van Zijl rebutted Quintero's view that SolarCity was insolvent, and Fischel — Musk's main expert — testified that the price Tesla paid was fair.[79]

Following post-trial briefing, the trial court heard post-trial oral argument on January 18, 2022.[80]   The court issued its written opinion on April 27, 2022.   We discuss the trial court's key findings next.

---

[78] *See id.*  Reicher serves as the Executive Director of Stanford University's Steyer-Taylor Center for Energy Policy and Finance.  His "expert report extensively detailed the immense growth potential of the solar industry in particular."  *Id.* at *47 n.551.

Foster is "an M&A practitioner" who was retained to review the "steps that a board should follow, when considering a major acquisition, to be consistent with custom and practice; or evaluating target companies, various potential targets should be considered."  A1826–27 (Jonathan Foster Trial Test. at 2459:3–6; 2461:15).

Van Zijl is a capital markets expert with "35 years of investment banking experience" who "has advised on hundreds of leveraged finance transactions."  A2132 (Musk's Post-Trial Reply Br. at 8 n.15).

Fischel is a scholar in the law and economics field and served as the dean of the University of Chicago Law School.  He was retained "to analyze the economic evidence in connection with the allegations" made by Appellants regarding the Acquisition.  A1832 (Daniel R. Fischel Trial Test. at 2481:8–12) [hereinafter Fischel Trial Test. at _].

[79] *See Trial Op.*, 2022 WL 1237185, at *6.

[80] On September 20, 2021, this Court issued its opinion in *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251 (Del. 2021).  As a result, the parties below stipulated to decertify the class, dismiss the direct claims, and submit only the derivative claims for decision.

32

### 3. The Trial Court's Fair Dealing Findings

The court first addressed the fair dealing analysis of the unitary entire fairness standard. The Vice Chancellor observed that "a controlling stockholder brings with him into the boardroom an element of 'inherent coercion.'"[81] But the court found "that any control [Musk] may have attempted to wield in connection with the Acquisition was effectively neutralized by a board focused on the *bona fides* of the Acquisition, with an indisputably independent director leading the way."[82] Although the court described Musk's "presence in the boardroom" as "problematic[,]" at times, it weighed the flaws against the process strengths and found that "the credible evidence produced at trial shows that" Musk did not exercise his purported control over the Tesla Board with respect to the Acquisition.[83]

The Vice Chancellor looked first at the flaws in the process, particularly Musk's involvement in negotiating the Acquisition. The court made 11 factual findings showing that Musk had participated in the deal process to a degree greater than he should have.[84] The "process flaws" — as the trial court described them — were:

- Several of Musk's communications with SolarCity's management about the Acquisition that were not disclosed to the Tesla Board.

- Musk's overtures to the Tesla Board about the Acquisition and his direction to Tesla's CFO to prepare a presentation on the Acquisition.

---

[81] *Trial Op.*, 2022 WL 1237185, at *33 (quoting *In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 436 (Del. Ch. 2002) and *SJ Op.*, 2020 WL 553902, at *5–6).

[82] *Id.* at *33.

[83] *Id.*

[84] *See id.* at *34.

- Musk's participation in the selection of Wachtell.

- Musk's review of the letter and blog post announcing the Initial Offer.

- Musk's involvement in Evercore's initial presentation to the Tesla Board and his push for a higher premium.

- Musk's frequent communications with the Evercore team, obtaining updates on timing and diligence.

- Musk's publication of the Master Plan Part Deux in an apparent attempt to garner Tesla stockholder support.

- Evercore informing Musk — before informing the Tesla Board — that it recommended lowering the terms of the Initial Offer.

- Musk's presence during part of a Tesla Board meeting regarding a revised offer.

- Musk's demonstration of the Solar Roof and his promises concerning the timing of the product launch.

- Kimbal's failure to be recused from both Tesla Board meetings and voting on the Acquisition.[85]

The trial court noted that these "process flaws flow[ed] principally from [Musk's] apparent inability to acknowledge his clear conflict of interest and separate himself from Tesla's consideration of the Acquisition."[86]

Upon recognizing these process flaws, the court then turned to what it identified as the strengths. It found six. The first involved the timing of the Acquisition, with the court noting that the Tesla Board did not begin negotiations upon Musk's initial requests but

---

[85] *See id.* at *34–35.

[86] *Id.* at *34.

rather waited until Tesla addressed issues with its EVs.[87]  The second was the deal structure:  notably, the inclusion of the majority-of-the-minority stockholder vote provision, Musk's and Gracias' recusals from voting, the selection of independent, experienced advisors to represent the Tesla Board, and Denholm's lead on the negotiations. Third, the court cited the due diligence and negotiations — overseen by Denholm — that resulted in the lower Final Offer.[88]

The fourth was the fact that the Tesla Board operated independently of Musk:  it did not begin negotiations when he said to, it did not include a bridge loan in its offers, and it took its time doing due diligence.[89]  The Tesla Board's insistence on a walkaway right in the event of a SolarCity debt covenant breach was also significant.  The court found that these facts suggested "an ultimately productive board dynamic that protected the interests of stockholders, despite [Musk's] assumed 'managerial supremacy' and the assumed board-level conflicts."[90]

Public knowledge of the Acquisition by the market, and by the Board during negotiations, was the fifth strength, with the court noting that there were "well-publicized debates and transaction modeling."[91]  It found that "[t]he material aspects of the Acquisition were known to Tesla stockholders."[92]  Moreover, the Definitive Proxy

---

[87] *See id.* at *36.

[88] *See id.* at *37.

[89] *See id.*

[90] *Id.*

[91] *Id.* at *38.

[92] *Id*.

disclosed which Tesla Board meetings Musk attended and that, on two occasions, voting members had asked Musk to provide his technical and strategic insights.[93]

Denholm's role leading the negotiations, according to the trial court, was the last process strength, with the court finding that she was "an independent, powerful and positive force during the deal process who doggedly viewed the Acquisition solely through the lens of Tesla and its stockholders."[94] She "served as an effective buffer between [Musk] and the Tesla Board's deal process."[95]

Regarding fair dealing, the trial court noted that the road leading to the Acquisition was not entirely smooth. The court found, however, that the "Tesla Board meaningfully vetted the Acquisition" and Musk "did not *impede* the Tesla Board's pursuit of a fair price."[96] Although Appellants assert that the court failed to make a finding of fair dealing, the court's opinion can only reasonably be read and understood as concluding that the flaws did not overcome the findings of the process strengths and that the process, overall, was the product of fair dealing. We address this point more fully in Section IV of this Opinion.

### 4. The Trial Court's Fair Price Findings

The focus next turned to the fair price analysis and the battle of the competing

---

[93] *See* AR500–09 (Definitive Proxy at 58–67); *see also* AR508 (Definitive Proxy at 66) (stating that at the July 22, 2016 special meeting of the Tesla Board, "[t]he Tesla Board requested that Mr. Elon Musk join the meeting to discuss with the other directors his views and expectations, in his capacity as Chief Executive Officer of Tesla, following a potential acquisition with respect to SolarCity's solar panel manufacturing operations and competitive positioning relative to the solar energy industry generally."). Following that, Musk left the meeting. *See id.*

[94] *Trial Op.*, 2022 WL 1237185, at *38.

[95] *Id.*

[96] *Id.* at *39 (emphasis in original).

experts. The court found that Musk prevailed in establishing that the price was fair: Musk "presented the most persuasive evidence regarding SolarCity's value and the fairness of the price Tesla paid to acquire it."[97] The court pointed to six factors and categories of evidence it relied upon in reaching its determination on fair price.

First, the trial court found that SolarCity was not insolvent, despite Appellants placing all of their eggs in the insolvency basket. Their theory was simple: SolarCity had no value and, thus, Tesla overpaid. The trial court rejected Quintero's testimony "that SolarCity was worthless[,]" instead finding that SolarCity "was solvent, valuable and never in danger of bankruptcy."[98] Second, the court found that the proffered DCF models by Quintero and Fischel were unhelpful and, thus, the court disregarded them.[99] Third, the court considered market evidence, which supported its finding of fair price. The trial court noted three pieces of market-based evidence: SolarCity traded in an efficient market, Tesla paid, at most, a small premium for SolarCity, and Tesla stockholders overwhelmingly

---

[97] *Id.* at *40.

[98] *Id.* At trial, SolarCity executives — including its CEO, CFO, and former CFO — confirmed that SolarCity was not insolvent or headed into bankruptcy. *See* A1758–59 (Lyndon Rive Trial Test. at 1732:18–1733:7); A1612 (Tanguy Serra Trial Test. at 997:18–24); A1810 (Brad Buss Trial Test. at 2393:3–10). Unrebutted testimony established that SolarCity never contemplated filing for bankruptcy and never took steps to retain restructuring advisors or counsel.

In addition, Quintero — Appellants' main valuation expert — abandoned his four illustrative valuations at trial. *See* A1586 (Quintero Trial Test. at 890:20–891:4). *See also Glob. GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 510 (Del. Ch. 2010) (declining to "engage in a speculative exercise based on tinkering with analyses that the two experts themselves essentially do not stand behind"), *aff'd*, 11 A.3d 214 (Del. 2010).

[99] *See Trial Op.*, 2022 WL 1237185, at *41 (stating that "Quintero and Fischel both performed DCF valuations" and that "neither expert persuaded me that a DCF analysis is the proper method by which to value SolarCity given the facts of this case, and so I decline to rely on the DCFs when analyzing whether the Acquisition was fair to Tesla's stockholders."). The court also noted that "the parties did not focus on DCF at trial or in their post-trial briefs[.]" *Id.*

voted in favor of the Acquisition. The court took into account Appellants' "argument regarding the quality (or not) of the Tesla stockholder vote"[100] in finding the stockholder vote compelling evidence of fairness.

Fourth, the trial court examined SolarCity's current and future cash flows. SolarCity derived its value from long-term cash flows, and that benefit flowed to Tesla after the Acquisition. As the court found, "Tesla has already realized approximately $1 billion in nominal cash flows and expects to realize at least $2 billion more from the legacy SolarCity systems."[101] Fifth, the trial court relied on Evercore's fairness opinion. Based upon Evercore's work negotiating for Tesla and doing due diligence, the trial court found Evercore's work credible and rejected a suggestion from Appellants that "Evercore was beholden to [Musk]."[102] And, finally, the trial court found that the potential synergies weighed in favor of finding fair price. Looking at the evidence put forth by Musk's experts, the court found that "Tesla expected the Acquisition to result in cost synergies of at least $150 million per year[.]"[103] The overlap between the two companies led to a vertically integrated enterprise with a renewed focused on renewable energy solutions, like EVs and solar panels, creating significant value, as the trial court found.[104]

Summarizing the fair price part of the entire fairness analysis, the trial court

---

[100] *Id.* at *44 n.515.

[101] *Id.* at *45.

[102] *Id.* at *46.

[103] *Id.* at *47.

[104] *See id.*

acknowledged that "where there are process infirmities, the Court is obliged to study fair price even more carefully."[105]  Its review of the evidence put forth at trial regarding the price Tesla paid for SolarCity led it to conclude that the price was fair.  Given that Appellants had proffered only "incredible" testimony that SolarCity was insolvent, the trial court's review of the evidence convinced it that no "fairer" price existed and that the price was not near the low end of a range of fairness but, rather, was "'*entirely*' fair in the truest sense of the word."[106]  Because of that, it found that Musk satisfied the entire fairness standard and, thus, did not breach his fiduciary duty.

*L.  Contentions On Appeal*

Appellants filed a timely appeal to this Court following the Court of Chancery's issuance of its post-trial opinion.[107]  They do not challenge the factual findings by the trial court.  Instead, they challenge the Vice Chancellor's application of Delaware's entire fairness standard of review.  Appellants contend that:

> The gravamen of the trial court's Opinion, based on an apples-to-oranges comparison, was that SolarCity's stock price on *June 21, 2016* (which was "affected" by pre-offer rumors and did not reflect full information) was marginally higher than the price paid for SolarCity with Tesla stock on *November 21, 2016*, so the price was entirely fair.[108]

> Regarding fair dealing, Appellants contend that the trial court "refused to issue any

---

[105] *Id.* at *48.

[106] *Id.* (emphasis in original).

[107] *See* A1 (Court of Chancery Docket).

[108] Opening Br. at 1–2 (emphases in original).

ruling at all with regard to fair process."[109]  They raise three arguments regarding the court's fair dealing analysis:  (1) the court "failed to find that Musk had not met his burden to prove fair dealing[,]" (2) the court focused its entire fairness analysis exclusively on fair price, and (3) the court "erroneously found that the unfair process did not affect the fairness of the price."[110]

As to fair price, Appellants contend that the trial court committed legal error in five ways:  (1) the court "applied a bifurcated entire fairness test that focused exclusively on fair price[,]" (2) the court "failed to determine SolarCity's value at the time the Acquisition closed" and instead improperly compared SolarCity's stock price from June 21, 2016 to its stock price right before the November 21, 2016 closing, (3) the court considered the "$1-3 billion of cash from SolarCity assets" Tesla expected to receive "but failed to include the $5.35 billion of SolarCity liabilities that Tesla immediately assumed as part of the Acquisition[,]" (4) the court "determined that discounted cash flow ('DCF') analyses were inappropriate to value SolarCity, yet relied on post-close undiscounted cash flows and the flawed DCF analyses from Tesla's financial advisor [Evercore]," and (5) the court "held that the Tesla stockholder vote supported a finding of fair price despite: (i) clear precedent that votes are presumed coerced in conflicted controlling stockholder transactions;" and (ii) acknowledging certain disclosure and cross-ownership issues meant the vote deserved "less weight[.]"[111]

---

[109] *Id.* at 6.

[110] *Id.*

[111] *Id.* at 6–7.

Musk responds that what the Appellants really seek is to retry this case. He contends that the Appellants push for a rigid approach to entire fairness not grounded in Delaware law. According to Musk, the trial court did not engage in a "bifurcated" entire fairness analysis, but rather, recognized that price plays a "paramount" role in the analysis.

This appeal — and the questions it raises regarding our highest level of judicial review — has also attracted the presence of a group of corporate law professors from institutions across the United States — the *amici* — who argue that the Court of Chancery erred when it put "heavy reliance" on "market-based evidence" to support its determination of fair price.[112] As explained below, we reject their characterization of the trial court's opinion.

## II. STANDARD OF REVIEW

"The standard and scope of appellate review of the Court of Chancery's factual findings following a post-trial application of the entire fairness standard to a challenged merger is governed by *Levitt v. Bouvier*."[113] "Accordingly, this Court will not ignore the

---

[112] Amicus Br. at 2. We note with disappointment that the *amici* state in their brief that "the Court of Chancery's opinion below placed 'heavy reliance'—indeed, nearly exclusive reliance—on 'market-based evidence' in concluding 'that Tesla paid a fair price for SolarCity.'" *Id.* They then cite to several pages of the trial court's opinion. The trial court's opinion, however, never uses the words "heavy reliance" in its market-based evidence discussion. Nor is it fair to say that the trial court nearly exclusively relied on market-based evidence.

Submission of *amicus* briefs lies solely within this Court's discretion, should we believe the submission will be helpful. A brief built upon an inaccurate premise and a misquotation of the trial court's opinion, however, is not helpful. Nor is it helpful to use disparaging phrases to describe a trial court opinion — for example, "this is deference to market evidence run amok." *Id.* at 5.

[113] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1178 (Del. 1995) ("*Cinerama II*") (citing 287 A.2d 671, 673 (Del. 1972)). In *Levitt*, we stated:

41

findings of the Court of Chancery if they are sufficiently supported by the record and are the product of an orderly and logical deductive process."[114] "Our review of the formulation and application of legal principles, however, is plenary and requires no deference."[115] "In addition, this Court accords 'a high level of deference' to Court of Chancery findings based on the evaluation of expert financial testimony."[116]

## III.   ANALYSIS

The Court of Chancery examined the Acquisition through the lens of the entire fairness standard — our corporate law's most rigorous standard of review. The trial court assumed, without finding, that the entire fairness standard applied. For example, it made no finding that Musk was Tesla's controlling stockholder.[117] Nor did it explicitly find that

---

In exercising our power of review, we have the duty to review the sufficiency of the evidence and to test the propriety of the findings below. We do not, however, ignore the findings made by the trial judge. If they are sufficiently supported by the record and are the product of an orderly and logical deductive process, in the exercise of judicial restraint we accept them, even though independently we might have reached opposite conclusions. It is only when the findings below are clearly wrong and the doing of justice requires their overturn that we are free to make contradictory findings of fact. When the determination of facts turns on a question of credibility and the acceptance or rejection of "live" testimony by the trial judge, his findings will be approved upon review. If there is sufficient evidence to support the findings of the trial judge, this Court, in the exercise of judicial restraint, must affirm.

287 A.2d at 673 (internal citations omitted).

[114] *Cinerama II*, 663 A.2d at 1179 (citing *Levitt*, 287 A.2d at 673).

[115] *Kahn v. Lynch Commc'n Sys., Inc.*, 669 A.2d 79, 84 (Del. 1995) ("*Lynch II*"). *See also Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997) ("*Tremont*") (noting that we "exercise *de novo* review concerning the application of legal standards.").

[116] *Cinerama II*, 663 A.2d at 1179 (quoting *Kahn v. Household Acq. Corp.*, 591 A.2d 166, 175 (Del. 1991)).

[117] We save for another day whether a stockholder with 22% of the voting power, but who may exercise "managerial supremacy," is a controlling stockholder. As the Vice Chancellor noted, "the source of [Musk's] control was hotly disputed. [Appellants] focused at trial on [Musk's]

42

a majority of the Tesla Board was conflicted.[118]  Instead, the court "skipped" straight to

entire fairness.  As the Vice Chancellor put it, "[w]hether by virtue of [Musk's] control, or

by virtue of irreconcilable board-level conflicts, there is a basis for *assuming that entire*

*fairness is the governing standard of review*."[119]

On appeal, the parties do not dispute that entire fairness controls.  In keeping with

our practice of addressing only issues fairly presented, we, too, view the Acquisition

through the lens of entire fairness.  This Court described the entire fairness standard of

review in our seminal decision, *Weinberger v. UOP, Inc.*,[120] as follows:

---

'managerial supremacy,' not his stock ownership or the voting power flowing from his stock.  Of course, that argument brings the controlling stockholder debate in clear focus.  Again, I have chosen not to enter into the fray of this debate, as the outcome does not depend on whether [Musk] is or is not a controller (or a controlling stockholder, if that is different)."  *Trial Op.*, 2022 WL 1237185, at *30 n.377 (internal citations omitted).

The fact that such a stockholder lacks the voting power to elect directors, approve transactions, or perhaps use her voting power to block transactions makes the question an important one, which can greatly affect the direction of our law, as well as the outcome of individual cases.  For example, expanding the definition of a "controller" expands the universe of persons who could be liable to stockholders under fiduciary principles, and it potentially excludes persons from "*Corwin* cleansing" and subjects them to the rigorous entire fairness standard of review.

[118] *See id.* at *2.  On potential Tesla Board conflicts, the Vice Chancellor noted the following:

> With regard to board-level conflicts, I acknowledge [Appellants'] arguments that each member of the Tesla Board, save Denholm, was either interested or lacked independence with respect to the Acquisition.  I have already reviewed the relevant evidence in that regard as I introduced each Tesla Board member in the Background section of this opinion.  Suffice it to say, there is a *bona fide* dispute regarding whether a majority of the Tesla Board was conflicted as it considered, negotiated and ultimately approved the Acquisition.  There is, therefore, a factual basis to justify an assumption that entire fairness is the standard of review on this basis alone.

*Id.* at *30 n.376.

[119] *Id.* at *30 (emphasis added) (internal citations omitted).

[120] 457 A.2d 701 (Del. 1983).

The concept of fairness has two basic aspects:  fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.  The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.  However, the test for fairness is not a bifurcated one as between fair dealing and price.  All aspects of the issue must be examined as a whole since the question is one of entire fairness.[121]

"The *requirement of fairness is unflinching in its demand* that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts."[122]  "[E]ntire fairness is the highest standard of review in corporate law[,]"[123] and "the defendants bear the burden of proving that the transaction with the controlling stockholder was entirely fair to the minority stockholders."[124]

"A determination that a transaction must be subjected to an entire fairness analysis is not an implication of liability."[125]  Even under our entire fairness standard, "[a] finding

---

[121] *Id.* at 711 (internal citations omitted).

[122] *Id.* at 710 (emphasis added).

[123] *MFW*, 88 A.3d at 644.  *See also In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013) (explaining that entire fairness is "Delaware's most onerous standard").

[124] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012).

[125] *Emerald P'rs v. Berlin*, 787 A.2d 85, 93 (Del. 2001) (citing *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993)).  For example, this Court has affirmed decisions of the Court of Chancery holding that a conflicted transaction was entirely fair. *See, e.g.*, *ACP Master, Ltd. v. Sprint Corp.*, 184 A.3d 1291 (Del. 2018) (ORDER); *S. Muoio & Co. LLC*, 35 A.3d 419 (Del. 2011) (ORDER); *Emerald P'rs v. Berlin*, 840 A.2d 641 (Del. 2003) (ORDER); *Lynch II*, 669 A.2d 79. *See also Cinerama II*, 663 A.2d at 1163 ("Because the decision that the *procedural* presumption of the business judgment rule has been rebutted does not establish *substantive* liability under the entire fairness standard, such a ruling does not necessarily present an insurmountable obstacle for a board of directors to overcome.") (emphases in original); *id.* ("Thus, an initial judicial determination that

44

of perfection is not a *sine qua non* in an entire fairness analysis."[126] Entire fairness is a unitary test, and both fair dealing and fair price must be scrutinized by the Court of Chancery. "It is a standard by which the Court of Chancery must carefully analyze the factual circumstances, apply a disciplined balancing test to its findings, and articulate the bases upon which it decides the ultimate question of entire fairness."[127]

The burden of proof rests with the defendant to prove that the transaction was entirely fair to stockholders. Although this Court has stated that "which party bears the burden of proof [in an entire fairness case] must be determined, *if possible*, before the trial begins[,]"[128] the trial court here did not determine — before trial — which party bore the burden of proof.[129] The court stated that it "need not decide the burden of proof question" because, in the court's words, "the evidence favoring the defense is that compelling."[130] Appellants contend that the Vice Chancellor "functionally shifted the burden to [Appellants] to prove that every aspect of the *process* was unfair,"[131] especially in

---

a given breach of a board's fiduciary duties has rebutted the presumption of the business judgment rule does not preclude a subsequent judicial determination that the board action was entirely fair, and is, therefore, not outcome-determinative *per se*.").

[126] *Cinerama II,* 663 A.2d at 1179.

[127] *Id.*

[128] *Ams. Mining*, 51 A.3d at 1243 (emphasis added).

[129] *See Trial Op.*, 2022 WL 1237185, at *32.

[130] *Id.* (internal citations omitted).

[131] Opening Br. at 3 (emphasis added). *See also* Reply Br. at 11 ("Thus, the trial court [] shifted the unfairness burden to [Appellants.]").

Appellants also contend that the trial court engaged in a burden shift when it "held that [Appellants] must satisfy this burden by proving Musk used actual threats and bullying tactics, rather than the inherent coercion that accompanied his status at Tesla and his improper intrusions into the deal process." *Id.*

connection with their theory of inherent coercion.[132] Again, we do not think that is an accurate reading of the trial court's opinion. The trial court stated, for example, that "[i]n sum, [Musk] proved that the process did not 'infect' the price."[133] It also found that Musk "presented credible evidence that Tesla paid a fair price for SolarCity[,]" whereas Appellants "answered by proffering incredible testimony that SolarCity was insolvent[.]"[134] The Court of Chancery, thus, correctly assumed that Musk had the burden.[135]

## IV. THE COURT OF CHANCERY DID NOT ERR IN ITS FAIR DEALING ANALYSIS

We begin with a brief overview of the fair dealing aspect of the entire fairness test. "The element of 'fair dealing' focuses upon the conduct of the corporate fiduciaries in effectuating the transaction."[136] A fair dealing analysis looks to "how the purchase was initiated, negotiated, structured and the manner in which director approval was obtained."[137] Fair dealing "also embraces the duty of candor owed by corporate fiduciaries

---

[132] *See* Opening Br. at 33 (arguing that the trial court required Appellants to show "evidence of actual exploitation of Musk's inherent coercion," rather than require Musk to show that he did not impede the fairness of process).

[133] *Trial Op.*, 2022 WL 1237185, at *39. The court also stated that it would "give no deference to [Musk] (or his fellow Tesla Board members) and will review [Appellants'] breach of fiduciary [duty] claim with the highest degree of scrutiny recognized in our law." *Id.* at *30.

[134] *Id.* at *48.

[135] *See Ams. Mining*, 51 A.3d at 1243 ("[I]f the record does not permit a pretrial determination that the defendants are entitled to a burden shift, the burden of persuasion will remain with the defendants throughout the trial to demonstrate the entire fairness of the interested transaction.").

[136] *Tremont*, 694 A.2d at 430.

[137] *Id.* at 431.

to disclose all material information relevant to corporate decisions from which they may derive a personal benefit."[138]

"This Court has held that arm's-length negotiation provides 'strong evidence that the transaction meets the test of fairness.'"[139]  Deal mechanisms commonly employed to replicate arm's-length negotiating include the use of a special committee and a majority-of-the-minority voting provision for stockholder approval.  Given the unitary nature of the test, findings in one area may seep into the findings of the other.  As a result, "[a] fair process usually results in a fair price."[140]  The opposite is also true:  "an unfair process can infect the price[.]"[141]

Although the entire fairness test is a fact-intensive analysis, Appellants do not challenge any of the factual findings or credibility determinations made by the Vice Chancellor.[142]  But in many respects, they ask us to re-weigh the evidence regarding the Acquisition's deal process and to reach the opposite conclusion:  namely, that the factual findings demand a finding of unfair dealing.[143]

---

[138] *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) (internal citation omitted). *See also Weinberger*, 457 A.2d at 711.

[139] *Cinerama II*, 663 A.2d at 1172 (quoting *Weinberger*, 457 A.2d at 709 n.7).

[140] *Ams. Mining*, 51 A.3d at 1244.

[141] *In re Trados*, 73 A.3d at 78 (internal citation omitted).

[142] Appellants confirmed that it is "[n]ot true" that they seek to "ask[] this Court to make contradictory findings."  Reply Br. at 4.  They stated the same at oral argument before this Court. *See* Oral Argument, at 19:36–40, https://livestream.com/accounts/5969852/events/10769099/videos/235611407, ("We're not challenging specific, factual findings.").

[143] For example, they argue that, based upon the trial court's findings, "the trial court should have ruled that the process was unfair as a matter of law."  Opening Br. at 36.  In our decision after remand in *Lynch II*, we observed that "[t]he absence of certain elements of fair dealing does not

A. *The Factual Findings Support A Determination Of Fair Dealing*

   1. *The Trial Court Made a Finding of Fair Dealing That is Supported by the Record*

The so-called *Weinberger* factors — how the deal was initiated and timed, how it was structured and negotiated, and how it was approved[144] — form the core of a court's fair dealing analysis. Despite *Weinberger* setting forth a helpful analytical path for a trial court to follow, the trial court here did not organize its discussion that way.[145] The court's opinion, heavily laden with findings in footnotes, perhaps left it vulnerable to the challenge that its analysis was incomplete and that the court, as Appellants put it, essentially wrote fair dealing out of the *Weinberger* analysis. Although our review was also made more difficult as a result, we believe the trial court's opinion can only reasonably be read as finding that, despite the process flaws, Musk carried his burden of establishing fair dealing.[146] In addition to its process-focused factual findings, the trial court, for example,

---

*mandate* a decision that the transaction was not entirely fair." 669 A.2d at 83 (emphasis added) (internal quotation marks and citation omitted); *see also Cinerama II*, 663 A.2d at 1179. The rigorous entire fairness analysis is heavily fact-driven and requires the court to make fact and credibility determinations after trial, to carefully scrutinize the transaction process, and to critically evaluate valuation and other evidence, including expert analyses, of fair price.

[144] *See* 457 A.2d at 711.

[145] The trial court's discussion of the process strengths, however, largely coincides with the *Weinberger* factors.

[146] Of course, as we have recognized, there is great flexibility in how opinions are crafted. *See, e.g.*, *Ams. Mining*, 51 A.3d at 1244 (noting that "[b]ecause the issues relating to fair dealing and fair price were so intertwined, the Court of Chancery did not separate its analysis, but rather treated them together in an integrated examination" and finding that approach to be "consistent with the inherent non-bifurcated nature of the entire fairness standard of review."). Nevertheless, clear and delineated findings, when possible, facilitate effective appellate review and may mitigate challenges founded on an alleged lack of clarity or incompleteness. *See Nixon*, 626 A.2d at 1378 ("The decision of the trial court did not plainly delineate and articulate findings of fact and

recognized "that a fair price does not ameliorate a process that was beyond unfair."[147] Further, we have thoroughly reviewed the extensive record and conclude that the record, including the trial court's unchallenged fact and credibility findings, supports a finding of fair dealing.

The parties put forth extensive evidence, and the Vice Chancellor grouped his factual findings and legal determinations into two categories: the process strengths and the process flaws. Using *Weinberger*'s list of factors, we consider Appellants' specific challenges to the trial court's findings and analysis.

### a. Initiation of the Acquisition

Appellants contend that the trial court found that Musk was "the catalyst and a vocal proponent of the Acquisition"[148] and that this supports a conclusion that Musk failed to meet his burden of proving his compliance with the *Weinberger* fair dealing factors. Musk points to other findings by the trial court, responding that the Vice Chancellor found that the Tesla Board declined to explore a transaction when Musk originally asked.[149] We also note, for example, the trial court's unchallenged finding that "Evercore reviewed the solar industry as a whole before recommending SolarCity as the obvious choice to be acquired."[150]

---

conclusions of law so that this Court, as the reviewing court, could fathom without undue difficulty the bases for the trial court's decision.").

[147] *Trial Op.*, 2022 WL 1237185, at *32 (internal quotation marks and citation omitted).

[148] Opening Br. at 31 (quoting *Trial Op.*, 2022 WL 1237185, at *1).

[149] *See* Answering Br. at 31.

[150] *Trial Op.*, 2022 WL 1237185, at *36.

For the trial court, calling Musk the "catalyst" behind the Acquisition did not tip the scale in favor of finding unfair dealing.[151]  As the trial court found, Musk did not force the hand of any Tesla Board member.[152]  And when Musk initially proposed — in February 2016 — a combination with SolarCity, the Tesla Board declined to follow through on his suggestion.

Appellants contend, as a general matter, "that Musk did exploit his inherently coercive status by repeatedly and improperly injecting himself into the Acquisition process."[153]  This concept of inherent coercion[154] was a focus of the trial court's overall fair dealing fact finding, as it "searched during [its] deliberations for persuasive evidence that [Musk] exploited the coercion inherent in his status as a controller to influence the Tesla Board's" process.[155]  But the trial court, after examining the evidence, including observing live testimony, rejected Appellants' contention that Musk exerted domination and control over the transaction process.  Instead, it specifically found that:

> [T]he evidence reveals that any control [Musk] may have attempted to wield
> in connection with the Acquisition was effectively neutralized by a board

---

[151] For example, we have observed that "[i]nitiation by the seller, standing alone, is not incompatible with the concept of fair dealing so long as the controlling shareholder does not gain financial advantage at the expense of the controlled company." *Tremont*, 694 A.2d at 431.

[152] *See Trial Op.*, 2022 WL 1237185, at *37 (finding that "the Tesla Board was not dominated by [Musk]").

[153] Opening Br. at 33.

[154] The concept of "inherent coercion" has often percolated in controlling stockholder transactions. This Court discussed the potential for inherent coercion in *Kahn v. Lynch Communication Systems, Inc.*, 638 A.2d 1110 (Del. 1994) ("*Lynch I*").  There, we stated that "'[e]ven where no coercion is intended, shareholders voting on a parent subsidiary merger might perceive that their disapproval could risk retaliation of some kind by the controlling stockholder.'" *Id.* at 1116 (quoting *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490, 502 (Del. Ch. 1990)).

[155] *Trial Op.*, 2022 WL 1237185, at *33.

50

focused on the *bona fides* of the Acquisition, with an indisputably independent director leading the way. [Musk] did not "engage[] in pressure tactics that went beyond ordinary advocacy to encompass aggressive, threatening, disruptive, or punitive behavior." In other words, even assuming [Musk] had the ability to exercise control over the Tesla Board, the credible evidence produced at trial shows that he simply did not do so with respect to the Acquisition.[156]

The court's overarching determination that Musk did not exploit any inherent coercion was adequately supported by numerous factual findings, which relate to other aspects of the fair dealing inquiry.[157] For example, the trial court concluded that there were "several instances where the Tesla Board simply refused to follow [Musk's] wishes."[158] It noted that the Tesla Board rejected Musk's wish to include a bridge loan in any offer; the Tesla Board insisted on having a walkaway right in the Final Offer should SolarCity breach the Liquidity Covenant; and the Tesla Board conducted significant due diligence, resulting in a lower deal price.[159] Because Appellants do not challenge any of these findings on appeal, they are entitled to deference by this Court.

### b. Timing of the Acquisition

At trial, Appellants "assert[ed] that [Musk] bailed out SolarCity on a schedule that worked for him."[160] As they contend before this Court: "Musk testified that the Acquisition was initiated because SolarCity either needed to raise money or be

---

[156] *Id.* (internal citations omitted).

[157] *See id.* at *36–39.

[158] *Id.* at *37.

[159] *See id.*

[160] *Id.* at *36.

51

acquired."[161]  This, they argue, suggests unfair dealing on Musk's part.

However, the trial court found the Acquisition's timing to be a process strength indicating fairness.  In rejecting the argument that Musk engineered a bailout convenient to his own timetable, the trial court found that "there was no bailout and the facts illustrate the timing was right for Tesla."[162]  Further, the Vice Chancellor found that, due to "macroeconomic headwinds in the industry, solar company stocks were trading at historic lows."[163]  And rather than proceed with a SolarCity deal when Musk originally pitched it in February 2016, the Tesla Board decided to wait and first address the company's rollout of the Model X.  The trial court's assessment of the industry conditions at the time support its finding of fair dealing, as the Tesla Board did not acquiesce in Musk's proposed timing, but instead, waited until the time was right for the company to explore a transaction.  We defer to these unchallenged findings that point to fair dealing.

---

[161] Opening Br. at 31 (internal quotation marks and citations omitted).

[162] *Trial Op.*, 2022 WL 1237185, at *36 (internal citation omitted).  In *Lynch II*, in our decision after remand, in upholding the Court of Chancery's finding that the conflicted transaction was entirely fair, we observed that:

> More to the point, the timing of a merger transaction cannot be viewed solely from the perspective of the acquired entity.  A majority shareholder is naturally motivated by economic self-interest in initiating a transaction.  Otherwise, there is no reason to do it.  Thus, mere initiation by the acquirer is not reprehensible so long as the controlling shareholder does not gain a financial advantage at the expense of the minority.

669 A.2d at 85 (citing *Cinerama II*, 663 A.2d at 1172 and *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 599 (Del. Ch. 1986)).

[163] *Trial Op.*, 2022 WL 1237185, at *36.  These "headwinds" included the fact that SunEdison, Inc. (one of SolarCity's competitors) filed for bankruptcy, changes in net metering laws, and the prospect that certain federal tax credits available to solar customers were possibly set to expire.

52

### c. *Structure of the Acquisition*

One common deal mechanism was included in the Final Offer: a majority-of-the-minority stockholder voting provision. The trial court found that this provision, which it called "one of the most extolled and powerful protections afforded Delaware stockholders," was another indicium of fair dealing.[164] Our case law recognizes "that the presence of a non-waivable 'majority of the minority' provision is an indicator at trial of fairness because it disables the power of the majority stockholder to both initiate and approve the merger."[165] It was not legal error for the Vice Chancellor to view the majority-of-the-minority voting provision as a strong indicator of fair dealing.[166]

Appellants claim that our affirmance of the trial court's opinion would disincentivize boards from complying with certain procedural mechanisms, like the use of a special, independent committee, in conflicted transactions. Appellants suggest that Tesla's failure to employ an independent negotiating committee is an indicium of unfair dealing. *Amici* argue that the Court of Chancery's approach threatens to fatally undermine the framework set forth in *MFW* by substantially negating the incentives *MFW* promotes.[167]

---

[164] *Id.*

[165] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1148 (Del. Ch. 2006) (citing *Jedwab*, 509 A.2d at 599–600 and *In re Pure Res.*, 808 A.2d at 442).

[166] In assessing the weight of the stockholder vote, the Vice Chancellor factored in the argument that the magnitude of the approval vote might be overstated given "the likelihood that *many stockholders who approved the Acquisition also owned SolarCity stock*." *Trial Op.*, 2022 WL 1237185, at *36 n.430 (emphasis added).

[167] For example, in *Americas Mining*, this Court observed that:

> A fair process usually results in a fair price. Therefore, the proponents of an interested transaction will continue to be incentivized to put a fair dealing process in place that promotes judicial confidence in the entire fairness of the transaction

53

Because one of Appellants' main arguments on appeal is that affirmance of the opinion below will undermine the best practices established by our decision in *MFW*, we explain why we reject that argument and why the record does not support that assertion.

By way of background, *Weinberger* recognized that certain procedural devices could alter the burden of proof in a conflicted transaction: there, we held that "where corporate action has been approved by an informed vote of a majority of the minority shareholders, [] the burden entirely shifts to the plaintiff to show that the transaction was unfair to the minority."[168] The standard of review remained entire fairness, but the potential for a burden shift created an incentive for boards in conflicted transactions to include majority-of-the-minority voting provisions.

In 1994, this Court, in *Lynch I*,[169] clarified the effect of certain procedural cleansing mechanisms in the context of controller squeeze-outs.[170] Relying on our decisions in *Weinberger* and *Rosenblatt v. Getty Oil Co.*,[171] we held in *Lynch I* that "an approval of the transaction by an independent committee of directors or an informed majority of minority shareholders *shifts the burden of proof* on the issue of fairness from the controlling or

---

price. Accordingly, we have no doubt that the effective use of a properly functioning special committee of independent directors and the informed conditional approval of a majority of minority stockholders will continue to be integral parts of the best practices that are used to establish a fair dealing process.

51 A.3d at 1244.

[168] 457 A.2d at 703.

[169] 638 A.2d 1110.

[170] *See also In re Pure Res.*, 808 A.2d at 436 (noting that *Lynch I* addresses "the 'inherent coercion' that exists when a controlling stockholder announces its desire to buy the minority's shares.").

[171] 493 A.2d 929 (Del. 1985).

dominating shareholder to the challenging shareholder-plaintiff."[172] Thus, the standard of review remained entire fairness.[173]

But the Court of Chancery, in the roughly decade following *Lynch I*, observed that the framework we outlined — which created the opportunity for controllers, in certain transactions, to shift the burden of proof — was not being fully utilized. Further, use of the two procedural mechanisms would yield no greater result than a burden shift under the entire fairness standard.[174] Then-Vice Chancellor Strine, in *In re Cox*, noted that what *Lynch I* created was "a modest procedural benefit" but little more than that.[175] In *dicta*, he suggested that Delaware law evolve and expand on *Lynch I* and suggested the following change to our standard of review governing certain transactions:

> The reform would be to invoke the business judgment rule standard of review when a going private merger with a controlling stockholder was effected

[172] 638 A.2d at 1117 (emphasis added). The potential to shift the burden in an entire fairness case creates strong incentives to employ such devices. *See Weinberger*, 457 A.2d at 703. *See also Rosenblatt*, 493 A.2d at 937 ("However, approval of a merger, as here, by an informed vote of a majority of the minority shareholders, while not a legal prerequisite, shifts the burden of proving the unfairness of the merger entirely to the plaintiffs.").

[173] *See Lynch I*, 638 A.2d at 1117.

[174] Our opinion in *Lynch I* "created a strong incentive for the use of special negotiating committees in addressing mergers with controlling stockholders." *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 618 (Del. Ch. 2005). But one result of that, as we explained in *Flood v. Synutra International Inc.*, was a preference to only use special committees because a majority-of-the-minority vote "'added an element of transactional risk without much liability-insulating compensation in exchange.'" 195 A.3d 754, 762 (Del. 2018) (quoting *In re Cox*, 879 A.2d at 618). Further, until *MFW*, the debate continued over what had been perceived by many to be an inability by a defendant to prevail on a pleadings-stage motion to dismiss a claim challenging a merger with a controlling stockholder.

[175] 879 A.2d at 617; *id.* (observing also that "[n]o defendant in *Lynch*, and no defendant since, has argued that the use of an independent special committee *and* a Minority Approval Condition sufficiently alleviates any implicit coercion as to justify invocation of the business judgment rule" and "[f]or this reason, it is important not to assume that the Supreme Court has already rejected this more precisely focused contention.") (emphasis in original).

using a process that mirrored *both* elements of an arms-length merger: 1) approval by disinterested directors; and 2) approval by disinterested stockholders.[176]

The Court of Chancery in *In re Cox* was of the view that its suggested reform "would improve the protections [offered] to minority stockholders and the integrity of the representative litigation process[.]"[177] Such a view, however, remained *dictum*, but became known as the "unified standard."[178]

The Court of Chancery confronted the concept of the "unified standard" and the potential consequences of *Lynch I* five years after *In re Cox* in *In re CNX Gas Corp. Shareholders Litigation*.[179] There, the court, looking to *In re Cox*, stated that "if a freeze-out merger is both (i) negotiated and approved by a special committee of independent directors and (ii) conditioned on an affirmative vote of a majority of the minority stockholders, then the business judgment standard of review presumptively applies."[180] But the trial court explicitly recognized in *In re CNX* that the question of which standard of review to apply remained an open question of law that this Court had yet to address:

> I recognize that by applying the unified standard, I reach a different conclusion than the recent *Cox Radio* decision, which opted to follow *Pure Resources*. The choice among *Lynch*, *Pure Resources*, and *Cox Communications* implicates fundamental issues of Delaware law and public policy that only the Delaware Supreme Court can resolve. Until the Delaware Supreme Court has the opportunity to address *Lynch* and *Siliconix*

---

[176] *Id.* at 606 (emphasis in original).

[177] *Id.* at 606.

[178] *See, e.g.*, Edward P. Welch et al., *Folk on the Delaware General Corporation Law, Fundamentals* § 141.02[N], at GCL-326 (2020 ed.).

[179] 4 A.3d 397 (Del. Ch. 2010).

[180] *Id.* at 412–13 (citing *In re Cox*, 879 A.2d at 606).

definitively, I believe the unified standard from *Cox Communications* offers the coherent and correct approach.[181]

Then came *MFW*. *MFW* answered a doctrinal question the corporate bar long had: did "the business judgment standard appl[y] to controller freeze-out mergers where the controller's proposal is conditioned on both Special Committee approval and a favorable majority-of-the-minority vote[?]"[182] *MFW* answered the question in the affirmative. In *MFW*, this Court adopted the standard that the Court of Chancery had suggested in the *In re Cox* and *In re CNX* decisions and described it as follows:

> To summarize our holding, in controller buyouts, the business judgment standard of review will be applied *if and only if:* (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.[183]

Both procedural protections must be "established *prior to trial*[.]"[184]  And when they are established, the transaction is then afforded the deferential business judgment

---

[181] *Id.* at 414 (internal citation omitted).

[182] 88 A.3d at 639.  As the Court of Chancery had observed, although language in *Lynch I* could be read to suggest that there were no scenarios where a merger with a controlling stockholder could avoid entire fairness review, that language was *dictum* because this Court had never squarely addressed the question of the appropriate standard of review where the merger was conditioned on both special committee approval and a majority-of-the-minority vote. *See In re MFW S'holders Litig.*, 67 A.3d 496, 522–24 (Del. Ch. 2013), *aff'd*, 88 A.3d 635.

[183] 88 A.3d at 645 (emphasis in original).  In *Synutra*, we clarified that "[t]o avoid one of *Lynch*'s adverse consequences—using a majority-of-the-minority vote as a chit in economic negotiations with a Special Committee—*MFW* reviews transactions under the favorable business judgment rule if these *two protections are established up-front*."  195 A.3d at 762 (citing *MFW*, 88 A.3d at 644) (emphasis added) (internal quotation marks omitted).

[184] *MFW*, 88 A.3d at 646 (emphasis in original).

standard of review. Under Delaware's business judgment rule, "the board's decision will be upheld unless it cannot be 'attributed to any rational business purpose.'"[185]

The absence of *MFW* protections, however, does not automatically result in a finding of liability. Appellants contend that the Vice Chancellor "acknowledged that the Board did not even consider creating an independent committee, which, as the trial court acknowledged, is the proper mechanism to negotiate a conflicted transaction."[186] Musk responds that they "advocate for a *per se* rule unsupported by case law" that would establish that failing to employ a special committee in a conflicted transaction would require "imposition of liability 'as a matter of law.'"[187] But Appellants respond that their position is not one advocating for a *per se* rule, but rather, is "that the absence of a special committee *plus* the numerous specific process flaws" requires the imposition of liability as a matter of law.[188]

As to the Tesla Board's decision not to form a special committee, the Vice Chancellor noted the following:

> There was a right way to structure the deal process within Tesla that likely would have obviated the need for litigation and judicial second guessing of fiduciary conduct. First and foremost, [Musk] should have stepped away from the Tesla Board's consideration of the Acquisition entirely, providing targeted input only when asked to do so under clearly recorded protocols. The Tesla Board should have formed a special committee comprised of indisputably independent directors, even if that meant it was a committee of one. The decision to submit the Acquisition for approval by a majority of the minority

---

[185] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

[186] Opening Br. at 35 (internal citations omitted).

[187] Answering Br. at 27 (internal citation omitted).

[188] Reply Br. at 6 (emphasis in original).

of Tesla's stockholders was laudable, and had the deal process otherwise been more compliant with the guidance provided by this court and our Supreme Court over many decades, it is likely there would be no basis to challenge the stockholder vote as uninformed. Of course, none of that happened.[189]

In other words, our decisions — which we continue to adhere to — have established a "best practices" pathway that, if followed, allow for conflicted transactions, such as the Acquisition, to avoid entire fairness review. Tesla's and Musk's determination not to form a special committee invited much risk (not to mention incursion of costs and diversion of personnel to litigation matters).[190] Although the Vice Chancellor aptly observed that perhaps the Tesla Board subjected itself to "unnecessary peril," we also recognize that there may be reasons why a board decides not to employ such devices, including transaction execution risk. Also, a board may wish to maintain some flexibility in the process, as the Tesla Board did here, by having the ability to access the technical expertise and strategic vision and perspectives of the controller.[191] Although we continue to encourage the use of special negotiation committees as a "best practice," nothing in Delaware law *requires* a

---

[189] *Trial Op.*, 2022 WL 1237185, at \*33 n.397.

[190] We have "repeatedly held that any board process is materially enhanced when the decision is attributable to independent directors. Accordingly, judicial review for entire fairness of how the transaction was structured, negotiated, disclosed to the directors, and approved by the directors will be significantly influenced by the work product of a properly functioning special committee of independent directors." *Ams. Mining*, 51 A.3d at 1243–44 (internal citations omitted).

[191] This is not to say that such access cannot be achieved effectively where a special negotiating committee and proper protocols have been established. *See, e.g.*, *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 12, 30 (Del. 2017) (noting that, although not a controlling stockholder, Michael Dell — who had 15% of the equity and pledged that his voting power would go to any higher bidder, voting in proportion to other shares — was available to all parties throughout the go-shop period).

59

board to form a special committee in a conflicted transaction.[192] Here, the price of not utilizing a special committee was being subjected to entire fairness review — an expensive, risky, and "heavy lift" in the litigation arena.[193]

Although Appellants argue that both *MFW* factors are required to neutralize the inherent coercion of a controller, that was exactly the issue the parties fought out in the trial on the merits. After hearing extensive testimony and reviewing voluminous evidence, the trial court "searched during [its] deliberations for persuasive evidence that [Musk] exploited the coercion inherent in his status as a controller" to influence the Tesla Board.[194] The court concluded that "any control [Musk] may have attempted to wield in connection with the Acquisition *was effectively neutralized* by a board focused on the *bona fides* of the Acquisition, with an indisputably independent director leading the way."[195] It amplified that holding, adding that "even assuming [Musk] had the ability to exercise control over the Tesla Board, *the credible evidence produced at trial* shows that he simply did not do so with respect to the Acquisition."[196] Thus, Appellants' theory that both *MFW* mechanisms were needed to neutralize Musk was tested in the trial arena, and the court

---

[192] *See, e.g.*, *Lynch II*, 669 A.2d at 85 (observing that "[h]ere Alcatel could have presented a merger offer directly to the Lynch Board, which it controlled, and received a quick approval" but adding that "[h]ad it done so, of course, it would have born the burden of demonstrating entire fairness in the event the transaction was later questioned."); *Rosenblatt*, 493 A.2d at 938 n.7 (noting that "the use of [a special] committee is not essential to a finding of fairness."); *In re Trados*, 73 A.3d at 76 (finding, in a transaction approved by a conflicted board, that "[a]lthough the defendant directors did not adopt any protective provisions . . . they nevertheless proved that the transaction was fair.").

[193] *See, e.g.*, *In re Trados*, 73 A.3d at 78.

[194] *Trial Op.*, 2022 WL 1237185, at *33.

[195] *Id.* (emphasis added).

[196] *Id.*

rejected it. The record supports the trial court's conclusion, which, we note, is heavily dependent upon unchallenged fact and numerous credibility determinations.

### d. Negotiation of the Acquisition

Although the process here had some flaws, the trial court found that "[t]he Tesla Board's process included several redeeming features that emulated arms-length bargaining to the benefit of Tesla stockholders."[197] For example, the Court of Chancery found that Denholm, whose independence was unquestioned, led the negotiations on Tesla's behalf. Appellants disputed this fact at trial, but the Vice Chancellor found that "Denholm led due diligence and negotiations with SolarCity" and that Denholm was "an extraordinarily credible witness."[198]

By Denholm's side were Tesla's indisputably independent advisors — Evercore and Wachtell. Evercore, in particular, updated the Tesla Board on its discussions with Lazard, including over SolarCity's liquidity concerns.[199] Neither Wachtell nor Evercore had performed work for either Tesla or SolarCity prior to their work on the Acquisition. Appellants did not seriously question their independence. As the trial court found,

---

[197] *Id.* at *36.

[198] *Id.* at *17 and *17 n.233. In the trial below, Appellants disputed that Denholm was in charge because "there are no Tesla Board minutes or resolutions that state the Tesla Board put Denholm in charge of the negotiations." *Id.* at *17 n.233. The Vice Chancellor explicitly rejected this contention and found the opposite: he noted that "[a]ll director testimony is consistent that Denholm was in charge. And there are special meeting minutes that imply the same." *Id.*

[199] In particular, the trial court made credibility determinations regarding Evercore, finding: "[i]n aid of Denholm's efforts, Evercore performed extensive diligence. McBean *credibly testified* that Evercore's 10-member team spent thousands of hours reviewing SolarCity's financial condition, conducting valuation analyses and negotiating with Lazard." *Id.* at *17 (emphasis added) (internal citation omitted).

"Wachtell was an independent and effective advisor to the Tesla Board."[200]  The court, as to Evercore, found that "Evercore was a diligent advisor with no previous ties to Tesla, and McBean credibly explained and defended its work and advice."[201]

Tesla made two formal offers — the Initial Offer and the Final Offer — before both sides approved the Acquisition.  And as the Vice Chancellor found, "[t]he information discovered during the due diligence process was used to lower the price substantially— even below the original offer range."[202]

Appellants contend that Musk pressed Evercore to accelerate the Acquisition process.  After trial, the Vice Chancellor did find that Musk "was in frequent communication with Evercore outside the boardroom throughout the process,"[203] but the court also found that "the preponderance of the evidence suggests that the purpose of [Musk's meetings with Evercore] was to speed up diligence, *not to influence the bankers* regarding substantive aspects of the Acquisition."[204]

Appellants also argue that Musk played an integral and decisive role in the entire deal process.  The Vice Chancellor found that Musk had an "apparent inability to

---

[200] *Id.* at *13 n.169.  With respect to Wachtell, the Vice Chancellor noted that although Musk "should not have been involved in the selection of counsel to advise the Tesla Board, as explained above, I am convinced that Wachtell was a qualified, independent advisor, not beholden to [Musk] in any way."  *Id.* at *34 n.413.

[201] *Id.* at *21 n.276.

[202] *Id.* at *37.

[203] *Id.* at *34.

[204] *Id.* at *34 n.416 (emphasis added).  McBean testified at trial that Musk never asked Evercore to change any of its presentations or advice that it provided to the Tesla Board.  *See* A1732 (McBean Trial Test. at 1628:5–8).

acknowledge his clear conflict of interest and separate himself from Tesla's consideration of the Acquisition."[205] We agree with the Vice Chancellor that the spillover effects of Musk's actions could have been mitigated had the Tesla Board formed a special negotiating committee. But we also note that Tesla's advisors, led by Wachtell, did work to insulate Musk from the process to a certain extent, namely, his recusal from certain meetings and from voting overall.

Here, the credibility findings made by the trial court regarding Tesla's lead negotiator are critical in this part of the analysis. The Vice Chancellor gave significant weight to Denholm's testimony. Denholm "served as an effective buffer between [Musk] and the Tesla Board's deal process."[206] Further, "[h]er credible and unequivocal endorsement of the Acquisition is highly persuasive evidence of its fairness."[207] At trial, Appellants did not challenge Denholm's independence or disinterestedness: in fact, according to them, she was the only Tesla director who was not conflicted.[208] What the record shows, then, is a negotiation process led by an indisputably qualified, disinterested director who was advised by indisputably independent legal counsel and financial advisors.

That negotiation process, led by Denholm, resulted in the Final Offer, which by its terms, was lower than the Initial Offer and Musk's first pitch. The trial court found that:

---

[205] *Trial Op.*, 2022 WL 1237185, at *34.

[206] *Id.* at *38.

[207] *Id.* The trial court referred to Denholm as a "disinterested decisionmaker[.]" *Id.* at *34.

[208] *See id.* at *4. Curiously, despite not challenging the factual findings on appeal, Appellants refer to Denholm as a "purportedly independent director" in their papers before this Court. *See* Reply Br. at 11.

Denholm led the diligence and negotiations . . . The information discovered during the due diligence process was used to lower the price substantially—even below the original offer range. Price increases or decreases that are the products of hard-nosed negotiations are strong evidence of fairness.[209]

The Vice Chancellor also found "that Evercore was dutiful in keeping the Tesla Board apprised of new developments and concerns, including the concerns related to SolarCity's growing liquidity challenges."[210] Negotiations that are "vigorous and spirited" are an indicium of fair dealing.[211]

### e. Approval of the Acquisition

The question under the last *Weinberger* fair dealing factor involves how the Acquisition was approved.[212] As we have noted, Appellants challenged all of the Tesla Board directors as conflicted except for Denholm. The Vice Chancellor explicitly stated that he "assum[ed] (*without deciding*) that . . . the Tesla Board was conflicted[.]"[213] Appellants' contention on appeal that "[t]he negotiation was handled by a conflicted Board that failed to supervise Musk"[214] is directly refuted by fact and credibility findings that they

---

[209] *Trial Op.*, 2022 WL 1237185, at *37 (internal citations omitted). The Tesla Board also secured an exchange ratio that would capture the benefit of an intervening price change for Tesla's stockholders. *See* AR507 (Definitive Proxy at 65) ("The Tesla board instructed its advisors to reject the Special Committee's proposal that the acquisition consideration should be based on a fixed value per share of SolarCity common stock, rather than a fixed exchange rate, given the increased uncertainty and risk of increased dilution to Tesla stockholders.").

[210] *Trial Op.*, 2022 WL 1237185, at *37.

[211] *Gesoff*, 902 A.2d at 1148. The trial court found that Denholm "directed Evercore in its selection of acquisition targets and was actively engaged with Evercore with respect to the development and delivery of its fairness opinion." *Trial Op.*, 2022 WL 1237185, at *38.

[212] Fair dealing "embraces questions of . . . how the approvals of the directors . . . were obtained." *Weinberger*, 457 A.2d at 711.

[213] *Trial Op.*, 2022 WL 1237185, at *2 (emphasis added).

[214] Opening Br. at 39.

do not challenge. We find no error in the trial court's heavily fact-and-credibility-laden determination[215] that the directors, following a rigorous negotiation process led by Denholm, were not "dominated" or "controlled" by Musk when they voted to approve the Acquisition.[216] In the next section, we explain why the Vice Chancellor's reliance on the stockholder vote as an indicium of fairness was not error.

2. *The Trial Court's Finding that the Stockholder Vote was Informed is Supported by the Record*

The final contention on appeal by Appellants regarding the deal process concerns the stockholder vote on the Acquisition. They contend that the trial court erred in relying on the stockholder vote, for five reasons. Those reasons are: (1) Musk's involvement in the deal process was not properly disclosed to stockholders; (2) Tesla's disclosures about the Solar Roof were misleading; (3) Evercore's warning to the Tesla Board about a potential breach of SolarCity's Liquidity Covenant was not disclosed; (4) SolarCity's credit

---

[215] "As an appellate court, we do not review determinations of credibility." *VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 83 (Del. 1998).

[216] For example, the Vice Chancellor stated that he was "satisfied that the Tesla fiduciaries placed the interests of Tesla stockholders ahead of their own." *Trial Op.*, 2022 WL 1237185, at *34. We note, however, that the Vice Chancellor found that "[e]ach arguably conflicted director credibly testified (and, in detail, explained how) he made his decision consistent with his duty of loyalty. Yet the facts implicating the potential for self-interest or lack of independence, all similar to scenarios where Delaware courts have found a reasonably conceivable disabling conflict on pled facts, were proven at trial (*e.g.*, familial ties, personal friendships, 'thick' business relationships, cross-investments, etc.)." *Id.* at *30 n.378. As he framed it, "[t]his raises the question whether credible (and convincing) testimony revealing loyal decision making can overcome proven facts revealing recognized scenarios where the *potential* for conflict exists. Here again, I raise but do not answer the question." *Id.* (emphasis in original).

Our decision to affirm does not rest upon potentially conflicted director testimony. As this Opinion makes clear, we are confident — after a full review of the record and oral argument of the parties — that Musk satisfied his burden of proving entire fairness.

65

downgrades were material to stockholders; and (5) several institutional stockholders held shares of both Tesla and SolarCity, raising questions of their disinterest and a reliance on their votes.

Delaware law on disclosure is well-settled. "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[217] In other words, it must be substantially likely that the omitted fact would have been viewed as having "significantly altered the total mix of information made available."[218] The duty of disclosure extends beyond material omissions, as "disclosures cannot be materially misleading" either.[219] It is against this well-established backdrop that we weigh Appellants' five disclosure contentions on appeal.

*First*, Appellants contend that certain aspects of Musk's involvement in the deal process were not disclosed to stockholders. They raise five sub-arguments:

> Musk's (i) failure to inform the Board about SolarCity's looming financial crisis; (ii) daily calls with Tesla's advisors and management; (iii) July 21, 2016 call with Evercore concerning Evercore's recommendation that Tesla lower its offer; (iv) preliminary discussions with his cousin about Tesla acquiring SolarCity; and (v) proposal to the Board at the March 2016 meeting to acquire SolarCity.[220]

These sub-arguments largely center around the extent to which Musk involved himself in the process. However, we reject them based upon our examination of the record

---

[217] *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018) (internal quotation marks and citation omitted).

[218] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (internal quotation marks and citation omitted).

[219] *Morrison*, 191 A.3d at 283.

[220] Opening Br. at 40.

evidence, which supports the Vice Chancellor's findings. As the trial court found, the Definitive Proxy "*did* disclose that [Musk] and Lyndon" Rive — Musk's cousin — had conversations, including in February 2016, about Tesla acquiring SolarCity.[221] Regarding the calls between Musk and Evercore, the Vice Chancellor stated that such an "omission may well have been material given [Musk's] conflicts."[222] Musk argues in response that a single disclosure issue, standing in the aggregate, does not change the calculus, especially in an entire fairness analysis. He points us to *In re Orchard Enterprises, Inc. Stockholder Litigation*, where the Court of Chancery stated that "a single disclosure problem may not be outcome-determinative" at trial.[223]

We agree that the trial court must evaluate an alleged disclosure violation in the context of the evidence as a whole. It is possible a single disclosure violation could, in certain circumstances, indicate larger issues with the deal process. It is equally possible that a single disclosure violation would not affect the total mix provided to stockholders.[224] As we previously noted, the Vice Chancellor found that the purpose of the calls between Musk and Evercore was not to set the terms of any potential offers, but rather, to check on the pace of diligence. Appellants do not challenge these factual findings, and we see no basis to disturb the Vice Chancellor's finding or weighing of this evidence.

---

[221] *Trial Op.*, 2022 WL 1237185, at *12 n.156 (emphasis in original).

[222] *Id.* at *18 n.250.

[223] 88 A.3d 1, 29 (Del. Ch. 2014).

[224] *See Brown v. Perette*, 1999 WL 342340, at *8 (Del. Ch. May 14, 1999) (noting that "disclosure of a single unadorned fact can quickly snowball into wide-ranging disclosure of facts and opinions that otherwise would never come before the shareholders."); *Khanna v. McMinn*, 2006 WL 1388744, at *34 n.272 (Del. Ch. May 9, 2006) (same).

*Second*, Appellants contend that Tesla affirmatively made misleading disclosures regarding the Solar Roof. They point to the demo Musk did in late October 2016, as well as a tweet sent out by Musk concerning the availability of the product. It is true that the trial court identified as a process flaw that Musk "publicly demonstrated the (inoperable) Solar Roof and made promises about the timing of the product launch to the market."[225] The court, however, expressly found no disclosure violations in connection with the Solar Roof:

> Although the Solar Roof demonstration was intended to garner stockholder support for the Acquisition, these statements either occurred after the stockholder vote, were qualified or were accurate. I am satisfied investors knew the Solar Roof was a part of Tesla's "vision for the future" and a "goal," not a ready-for-market product offering.[226]

As the trial court found, "Tesla filings and press releases regarding the Solar Roof presentation were qualified with language that made clear the product was part of Tesla's 'vision for the future' and something 'the combined company *will be* able to create.'"[227]

And as to Appellants' claim that Musk's tweets about the Solar Roof constituted disclosure violations, the Vice Chancellor found that Appellants exhibited "temporal confusion" because Musk's comments about the Solar Roof occurred after the stockholder vote, meaning, logically, that his comments could not have affected the vote.[228] Regarding certain of Musk's tweets that occurred *prior* to the vote, the Vice Chancellor found that

---

[225] *Trial Op.*, 2022 WL 1237185, at *34.

[226] *Id.* at *34 n.420 (internal citations omitted).

[227] *Id.* at *45 (internal citation omitted) (emphasis in original).

[228] *See id.* at *45.

68

they "were optimistic—perhaps overly so—but Tesla did, in fact, expect a product launch in mid-2017."[229] The trial court found that SolarCity had been working on the Solar Roof since 2015 and that Musk's statements were "not a prop created to secure the vote."[230] The record supports that conclusion.

*Third*, Appellants argue that the Vice Chancellor "found that Evercore advised the Board that a SolarCity breach of its liquidity covenant would threaten SolarCity's solvency" — which, they contend, was not disclosed to Tesla stockholders.[231] However, the trial court found that "[t]he market generally understood SolarCity's liquidity challenges"[232] and that Appellants' "expert witnesses, Moessner and Beach, conceded that market participants were aware of the risk that SolarCity might breach its Liquidity Covenant."[233] These unchallenged factual findings are supported by the record and cannot be squared with Appellants' contention that material facts were not disclosed to the stockholders by the time of the vote.

*Fourth*, Appellants contend that a disclosure violation exists because Tesla stockholders were not informed about SolarCity's credit downgrades.[234] They also claim that the Vice Chancellor erred in holding that "SolarCity's failure to disclose information

---

[229] *Id.*

[230] *Id.*

[231] Opening Br. at 42.

[232] *Trial Op.*, 2022 WL 1237185, at *38.

[233] *Id.* at *42. Further, the preliminary proxy statement contained "a description of the risks posed by SolarCity's liquidity challenges." *Id.* at *22.

[234] *See* Opening Br. at 42.

related to its credit downgrades was immaterial."[235]  Among other things, the court observed that "[i]f SolarCity's largest lender was undeterred by the change in credit rating, it is difficult to see how or why the market would have viewed the information differently."[236]  We agree with the trial court's weighing of the evidence in assessing the materiality of this information.  The trial court also expressly grounded its holding on the "credible evidence presented at trial."  We have no basis in the record to disturb these findings.

Appellants' *fifth* disclosure contention relates to the potential crossholdings of stock by institutional investors.  Appellants contend that the Court of Chancery did not decide the issue of whether these stockholders were disinterested and yet still factored the vote into the analysis.  However, as the trial court stated, Fischel analyzed Appellants' "cross-holdings" claim.  For example, Fischel analyzed 25 of Tesla's top institutional holders.  Of those, 17 also held SolarCity stock, "[b]ut only 5 of those 17 had greater stakes in SolarCity than Tesla."[237]  The trial court, considering the "quality" of the stockholder vote, ultimately concluded that "[e]ven with these issues in mind, however, I cannot, as factfinder, conclude that such a large majority of Tesla's stockholders would have voted to approve a transaction whereby Tesla would acquire an insolvent energy company, as [Appellants] would have me believe."[238]  The Vice Chancellor explained that he gave "less weight to

---

[235] *Trial Op.*, 2022 WL 1237185, at *43.

[236] *Id.*

[237] A1845 (Fischel Trial Test. at 2532:13–14).

[238] *Trial Op.*, 2022 WL 1237185, at *44 n.515.

70

the Tesla stockholders' approval of the Acquisition than [he] might have otherwise in recognition of [Appellants'] disclosure arguments and their argument that the magnitude of the approval vote might be overstated given the likelihood that many stockholders who approved the Acquisition also owned SolarCity stock."[239] We find no error with the Vice Chancellor's determination to give the vote some weight.

In weighing the stockholder vote on the Acquisition, the court again found Fischel's testimony particularly persuasive. Fischel testified that the Tesla stockholder vote was "the ultimate market test," that if anyone believed that SolarCity was insolvent, "all they had to do was reject the offer[,]" and similarly for Tesla stockholders who thought the deal was beneficial, they could vote in favor of it.[240] He testified as to the robust public commentary regarding liquidity issues, as well as commentary characterizing the deal as a "bailout" and the result of a process "steeped in conflicts."[241] He further testified as to the sophistication of the stockholder base, which contained "many of the most sophisticated institutions in the world."[242]

In sum, we reject all five claims of error. The record supports the Vice Chancellor's conclusion that "[t]he material aspects of the Acquisition were known to Tesla stockholders."[243]

---

[239] *Id.* at *36 n.430.

[240] *Id.* at *44 (internal quotation marks and citation omitted).

[241] *Id.*

[242] A1844 (Fischel Trial Test. at 2529:20–21).

[243] *Trial Op.*, 2022 WL 1237185, at *38.

Finally, we reject Appellants' contention that the Vice Chancellor failed to adequately find that the Acquisition was the product of fair dealing. Musk was required to prove fair dealing. Both aspects of the entire fairness test — fair dealing and fair price — must be satisfied. "[A] party does not meet the entire fairness standard simply by showing that the price fell within a reasonable range that would be considered fair."[244]

The trial court, citing cases to this effect, recognized that principle and found that Musk carried his heavy burden. The trial court's findings — which, again, are factual determinations not challenged by the Appellants — support the conclusion that the process, overall, was the product of fair dealing. The Vice Chancellor did not ignore the process flaws, but rather, he considered them in his overall assessment of the process. For example, he noted that "the recusal protocol was not precise" as to Musk attending certain Tesla Board meetings and that this was a flaw in the process.[245] But he also acknowledged that "the Tesla Board believed that [Musk's] and Gracias' perspectives regarding the solar industry and SolarCity, in particular, would be helpful, so it was agreed that the two could participate in certain high-level strategic discussions regarding the Acquisition."[246] This

---

[244] *William Penn P'rship v. Saliba*, 13 A.3d 749, 757 (Del. 2011); *id.* at 758 ("Merely showing that the sale price was in the range of fairness, however, does not necessarily satisfy the entire fairness burden when fiduciaries stand on both sides of a transaction and manipulate the sales process.") (internal citation omitted). *See also Tremont*, 694 A.2d at 432 ("[H]ere, the process is so intertwined with price that under *Weinberger*'s unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (holding that "directors must establish to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price.") (emphases in original), *modified on other grounds*, 636 A.2d 956 (Del. 1994).

[245] *Trial Op.*, 2022 WL 1237185, at *15 n.197.

[246] *Id.* at *15.

was disclosed in the Definitive Proxy.[247]

The court found that overall, "the preponderance of the evidence reveals that [Musk's] influence did not degrade the entire fairness of the Acquisition."[248] It noted that "[t]he Tesla Board's process included several redeeming features that emulated arms-length bargaining to the benefit of Tesla stockholders."[249] Further, "an ultimately productive board dynamic [] protected the interests of stockholders, despite [Musk's] assumed 'managerial supremacy' and the assumed board-level conflicts."[250] And specifically, the court concluded that "under Denholm's leadership, the Tesla Board meaningfully vetted the Acquisition"[251] and that, under Denholm's direction and influence as a "disinterested decisionmaker," the "Tesla fiduciaries placed the interests of Tesla stockholders ahead of their own."[252] Thus, although the trial court could have stated its fair dealing conclusion more clearly and explicitly, its opinion — fairly read — determines that despite certain process flaws, the Acquisition was the product of fair dealing. We also conclude, based upon our independent review of the record, that the record supports such a determination.

---

[247] *See id.* at *15 n.197.

[248] *Id.* at *33.

[249] *Id.* at *36.

[250] *Id.* at *37 (internal citation omitted).

[251] *Id.* at *39.

[252] *Id.* at *34.

## V. THE TRIAL COURT DID NOT REVERSIBLY ERR IN ITS FAIR PRICE ANALYSIS

We now turn to fair price. We conclude that the record supports the Court of Chancery's legal conclusion that the price paid was a fair one and that the trial court did not misapply the entire fairness standard.

As this Court has said, a fair price analysis typically applies "recognized valuation standards[.]"[253] "In resolving issues of valuation[,] the Court of Chancery undertakes a mixed determination of law and fact."[254] Our "precedent establishes that the fair price and fair value standards call for equivalent economic inquiries."[255] It is important to note, however, that "[t]he fair price aspect of the entire fairness test, by contrast, is not in itself a remedial calculation."[256] Thus, "[a] price may fall within the range of fairness for purposes of the entire fairness test even though the point calculation demanded by the

[253] *Lynch II*, 669 A.2d at 87. *See also Rosenblatt*, 493 A.2d at 940 ("Fair price involves all relevant economic factors of the proposed merger, such as asset value, market value, earnings, future prospects, and any other elements that affect the inherent or intrinsic value of a company's stock.") (citing *Weinberger*, 457 A.2d at 711); *Weinberger*, 457 A.2d at 713 (noting that a fair price analysis requires use of "techniques or methods which are generally considered acceptable in the financial community").

[254] *Tremont*, 694 A.2d at 432. Such a determination is entitled to deference by this Court: "[w]e recognize the thoroughness of the [Court of Chancery's] fair price analysis and the considerable deference due [its] selection from among the various methodologies offered by competing experts." *Id.*

[255] *In re Orchard*, 88 A.3d at 30. *See also Gesoff*, 902 A.2d at 1152 n.127 ("[I]n general, the techniques used to determine the fairness of price in a non-appraisal stockholder's suit are the same as those used in appraisal proceedings.").

[256] *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *18 (Del. Ch. July 21, 2017), *aff'd*, 184 A.3d 1291. *See also Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 465 (Del. Ch. 2011) ("The fair price analysis is part of the entire fairness standard of review; it is not itself a remedial calculation.").

appraisal statute yields an award in excess of the merger price."[257]

Here, Appellants attack Musk's evidence on fair price, which the Court of Chancery largely found to be credible. Their fair price challenge is five-fold: (1) the trial court applied a bifurcated entire fairness test; (2) the trial court employed "rote reliance" on market price; (3) the trial court did not look to SolarCity's value at the time of closing; (4) the trial court erroneously considered cash flows and synergies; and (5) the stockholder vote did not prove fair price.[258] We consider each challenge and conclude that the trial court committed no reversible error.

A. *The Trial Court Did Not Apply A Bifurcated Analysis*

Appellants first contend that the "court applied a bifurcated entire fairness test, concluding that its separate fair price analysis alone satisfied entire fairness."[259] In essence, they argue that the Vice Chancellor looked at price and price alone.[260] We disagree with Appellants' reading of the Court of Chancery's opinion, which, among other things, makes extensive fact and credibility findings relating to the Acquisition's process. The trial court also expressly recognized that "[e]ntire fairness is a composite" and is not a bifurcated

---

[257] *In re Orchard*, 88 A.3d at 30. The Court of Chancery has noted that our case law "has not equated satisfying the standards of review that govern fiduciary duty claims with carrying the burden of proof in an appraisal proceeding. Because the two inquiries are different, a sale process might pass muster for purposes of a breach of fiduciary claim and yet still constitute a sub-optimal process of an appraisal." *Merion Cap. L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *15 (Del. Ch. Dec. 16, 2016).

[258] *See* Opening Br. at ii.

[259] *Id.* at 44.

[260] The *amici* join in and argue that Musk satisfied his burden "by reference chiefly to the pre-announcement price[.]" Amicus Br. at 21.

test.[261]

Nevertheless, Appellants are correct that fair price played a large role in the trial court's analysis. Though the entire fairness test is a unitary one, we have long recognized that, sometimes, a fair price is the most important showing.[262] "Evidence of fair dealing has significant probative value to demonstrate the fairness of the price obtained. The *paramount consideration, however, is whether the price was a fair one*."[263] That is not to say that an alleged controller can shirk her fiduciary duties and hide behind the price she pays. "[T]he range of fairness is not a safe-harbor that permits controllers to extract barely fair transactions."[264] Here, given the process flaws as found by the trial court, the court had to conclude that those flaws did not infect the price in order to find that the price was fair. That is what it did, finding that, ultimately, the process did not impact the price, which was "not near the low end of a range of fairness[.]"[265] Although Appellants raise certain legitimate criticisms as to a certain part of the trial court's fair price analysis, given the

---

[261] *Trial Op.*, 2022 WL 1237185, at *31.

[262] In *Weinberger*, this Court stated that "in a non-fraudulent transaction we recognize that price may be the *preponderant consideration* outweighing other features of the merger." 457 A.2d at 711 (emphasis added). When looking at fair price, we analyze a variety of factors, as does the trial court. *See In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *34 (Del. Ch. Aug. 27, 2015) ("The principal evidence on the issue of fair price consists of the expert opinions at trial, the Committee's negotiations, Lazard's fairness opinion, and market indications.").

[263] *Ams. Mining*, 51 A.3d at 1244 (emphasis added). *See also In re Dole Food*, 2015 WL 5052214, at *34 ("Fair price can be the predominant consideration in the unitary entire fairness inquiry.").

[264] *ACP Master*, 2017 WL 3421142, at *19. *See also Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *37 (Del. Ch. July 6, 2018) (same), *aff'd*, 221 A.3d 100 (Del. 2019) (ORDER).

[265] *Trial Op.*, 2022 WL 1237185, at *48 (internal quotation marks and citation omitted).

other evidence of fair price, we find no reversible error in the court's overall determination that the price was fair.

### B. The Credible Evidence Supports The Fairness Of The Price

#### 1. Musk Presented "Persuasive Evidence" of SolarCity's Solvency, While Quintero's Insolvency Valuation Theory was "Incredible"

Appellants' claims as to fair price focus on whether the court afforded too much weight to market evidence. They contend that "[t]he trial court rejected all expert valuation methodologies and concluded that Tesla paid a fair price by relying on a stale SolarCity stock price from when Tesla's preliminary proposal was announced."[266] More specifically, they assert that "[t]he only valuation 'methodology' the court purported to employ . . . was to look at the $20.35/share value of the Tesla stock paid at closing *on November 21* compared to SolarCity's $21.19/share 'unaffected stock price' *from June 21*[.]"[267] As a result of that mistake, they say the court erred in concluding that Tesla paid no premium.

However, market evidence of SolarCity's stock price was only one part of the evidence considered by the trial court in its fair price analysis. Although it is true that the court addressed market evidence to a greater degree than the DCF analysis, for example, that is a function of how the parties litigated the case. Appellants gloss over the fact that they pressed a single fair price valuation theory at trial, namely, that SolarCity was insolvent. As the Vice Chancellor found, Appellants "placed their valuation case entirely in Quintero's hands, and Quintero, in turn, relied exclusively on a single valuation theory:

---

[266] Opening Br. at 46.

[267] Reply Br. at 19 (emphases in original).

77

insolvency."[268]  However, that strategy did not pan out.[269]

At trial, Quintero calculated and relied upon what he determined to be SolarCity's "net liquidation value," which he stated was the appropriate measurement due to SolarCity's failure as a going concern.[270]  To reach his conclusion that SolarCity was insolvent, Quintero ran two types of tests:  balance sheet tests and cash flow tests, each with two variations.  Both tests, in his view, resulted in the same conclusion:  SolarCity was not a going concern.  The two balance sheet tests looked at current liabilities versus current assets and then all assets and all liabilities.[271]  According to Quintero, SolarCity had a net working capital deficit of $422.9 million.[272]  The two cash flow tests employed by Quintero looked at whether SolarCity could pay its obligations as they came due and then the size of SolarCity's capital.[273]  Under both the balance sheet and cash flow tests, SolarCity was, in Quintero's opinion, insolvent.[274]

---

[268] *Trial Op.*, 2022 WL 1237185, at *40 (internal citations omitted).

[269] As the Vice Chancellor described, they "went 'all in' on insolvency, arguing that SolarCity was worthless when Tesla acquired it, so any price paid by Tesla was too high."  *Id.* at *40.  And as the Vice Chancellor put it, their strategy consisted of "swinging for the fences" and arguing for a SolarCity maximum value of zero dollars.  Based upon their proffered valuation of zero dollars for SolarCity, Appellants argued that "compensatory damages should be the full value of the Acquisition consideration: $2.058 billion (at $20.35/share) to $2.443 billion (at $24.16/share)."  A2113 (Appellants' Post-Trial Reply Br. at 33).

[270] A586 (Quintero Rep. at 5).  Quintero testified at trial that, "[b]ased on the financial performance and condition of SolarCity as of the merger date, net liquidation value is the appropriate premise of value."  A1507 (Quintero Trial Test. at 706:20–22).

[271] *See id.* (Quintero Trial Test. at 708:2–17).

[272] *See* A1532 (Quintero Trial Test. at 807:14–16).

[273] *See* A1508 (Quintero Trial Test. at 709:6–14).

[274] *See id.* (Quintero Trial Test. at 710:5).

Quintero's expert report (the "Quintero Report") focused on one key aspect of SolarCity: liquidity problems, including the risk of tripping the Liquidity Covenant.[275] "SolarCity was highly debt dependent"[276] and had "[l]iabilities that exceeded net assets (excluding the net assets of the [variable interest entities]) by approximately $650 million as of the" Acquisition.[277] Net liquidation value — the key financial calculation in the Quintero Report — is defined as "the net amount that would be realized if the business is terminated and the assets are sold piecemeal."[278] The Quintero Report relied upon "orderly liquidation value," which "[a]ssumes the assets are sold piecemeal with a reasonable amount of time allowed for market exposure."[279] It concluded that the average net liquidation value of SolarCity was negative $1.952 billion.[280] Thus, according to the Quintero Report, "the common stock of SolarCity would be worthless on a liquidation basis."[281]

SolarCity's stock trading price did not factor into Quintero's analysis, as he concluded that its stock "essentially became a Tesla tracking stock up until the

[275] *See* A605–20 (Quintero Rep. at 24–39). *See also supra* Sections I.D.2, I.F., I.G.2, I.G.4. One of the Appellants' other experts, Juergen W. Moessner, testified at trial that the market was aware of the risk SolarCity had with tripping the Liquidity Covenant. *See* A1502 (Moessner Trial Test. at 686:9–20).

[276] A624 (Quintero Rep. at 43).

[277] A628 (Quintero Rep. at 47).

[278] A652 (Quintero Rep. at 71).

[279] *Id.* Orderly liquidation value differs from "forced liquidation value," which "[a]ssumes the assets are sold piecemeal with less than normal exposure as in a distressed sale." *Id.*

[280] *See* A805 (Quintero Rep. at Exhibit 53).

[281] *See id.*

[Acquisition] closed, and SolarCity shareholders actually received Tesla common stock in exchange for their SolarCity common stock."[282]  Although Quintero prepared a DCF analysis, he assigned it no value.[283]  He also rejected the fairness opinions of Evercore and Lazard, as he found they did "not provide an appropriate basis for determining the fair value of SolarCity" since they both determined that the company operated as a going concern.[284]  At trial, Quintero testified as to his net liquidation analysis.  He confirmed repeatedly that it was the proper method by which to value SolarCity.

Musk's lead expert at trial, Fischel, testified that Quintero's net liquidation valuation was "irrelevant for analyzing what I consider to be the relevant economic question in this case, which is the value of the assets purchased to SolarCity that are going to continue [] as opposed to SolarCity being liquidated."[285]  Upon his review of "economic data, stock price data, acquisition data, all kinds of data from analysts on price targets and all kinds of different types of analysis, economic data[,]" he did not see "a single piece of evidence that supports the claim that SolarCity was insolvent at the time of the acquisition."[286]  According to Fischel, no one in the industry — apart from Quintero — "thought it was

---

[282] A677 (Quintero Rep. at 96).

[283] *See* A724 (Quintero Rep. at 143).  Quintero testified at trial that he viewed DCF analysis as a highly speculative approach.  *See* A1580 (Quintero Trial Test. at 868:19–24).

[284] A726 (Quintero Rep. at 145).  *See also* A1529 (Quintero Trial Test. at 795:23–796:4).

[285] A1833 (Fischel Trial Test. at 2485:15–19).

[286] *Id.* (Fischel Trial Test. at 2486:2–10).  Fischel testified that, if stockholders believed SolarCity was insolvent, they would not have voted for the Acquisition "because they were the ones who would have been the most harmed."  A1845 (Fischel Trial Test. at 2533:1–2).  He also pointed to SolarCity's trading price on June 21 of $21.19 and opined that "[i]nsolvent firms don't have equity trading at $21.19."  A1835 (Fischel Trial Test. 2493:5–6).

appropriate to value SolarCity based on liquidation value."[287]  In rejecting Quintero's insolvency analysis, the trial court cited Musk's "persuasive valuation evidence."[288]  In addition to Fischel's testimony, Musk's evidence included:  a contemporaneous analysis done by KPMG, showing that SolarCity was not insolvent; Tesla's 10-K, reporting an $89 million gain on the Acquisition; Evercore's analysis; and other financial testimony on cash flows and retained value.[289]

The trial court weighed evidence as to SolarCity's supposed insolvency and resoundingly rejected the insolvency theory.  As the court noted, Quintero "doubled down" on his insolvency theory to such a degree that, when weighed against the evidence put forth by Musk's experts, Appellants "undermined the credibility of their fair price case completely."[290]  Thus, the trial court found that, despite SolarCity's financial issues, the company "was solvent, valuable and never in danger of bankruptcy."[291]  A review of the record and the opinion below reveals that this finding is adequately supported by the record.

The trial court attempted to ascertain whether Appellants relied on any other fair price theory or analysis besides insolvency.  In response to questions from the trial court, Quintero completely disclaimed reliance on any valuation metric or methodology other than his insolvency valuation theory:

THE COURT:  All right.  I just have a couple questions to understand the

---

[287] A1850 (Fischel Trial Test. at 2554:5–6).

[288] *Trial Op.*, 2022 WL 1237185, at *41.

[289] *See id.* at *41 n.481

[290] *Id.* at *40.

[291] *Id.*

81

big picture of what you are telling the Court. As I understand it, the flag that you put in the ground on valuation, and that you would have me adopt, is a liquidation value of Tesla [*sic*] as of November, the date of the closing of this merger. That's the value that you believe in, as you have analyzed the data provided to you. Is that fair?

THE WITNESS: Yes, sir, based on professional appraisal.

THE COURT: The rest of this illustrative -- I'm trying to understand the point of the illustrative valuations. As I understand that, those are not methodologies that you believe in for this company. Is that accurate?

THE WITNESS: That is correct. Not as of the merger date.

THE COURT: All right. So as I look at the big picture of your testimony and your report, what I should be focusing on is whether I believe in the liquidation value premise that you are offering. Right? That's the main essence of your testimony?

THE WITNESS: That is correct.

THE COURT: So the DCF, for example, that you performed, you don't believe in that valuation?

THE WITNESS: No, it is only alternative information I have provided you for informational purposes.

THE COURT: But I guess that's what I'm trying to get at. What is the information that gives me that is useful in terms of deciding the dispute? Because it's a valuation that you do not endorse. Is that --

THE WITNESS: The sole purpose would be if, Your Honor, you came to a view that Tesla was a going concern, I have provided you four alternative valuation analyses, albeit with very substantial caveats.

THE COURT: Right. And my understanding is that, as to each of them, from your perspective, they do not reflect the appropriate means by which to value this company.

THE WITNESS: That's correct, based upon professional appraisal standards.[292]

The result, after the court found Quintero's insolvency theory to be "incredible" —

and Appellants disavowed any other theories — is that Appellants were left with no

credible fair price evidence. As the trial court recognized, "in a plenary breach of fiduciary

---

[292] A1585–86 (Quintero Trial Test. at 889:6–891:4).

duty action, the court's function when assessing fair value is not to conduct its own appraisal but to land where the preponderance of the credible and competent evidence of value takes it."[293] In the end, the Vice Chancellor found "no credible basis in the evidence to conclude that a 'fairer' price was available, and therefore, no basis to conclude that the price paid was not entirely fair."[294]

Musk, on the other hand, in addition to refuting Appellants' insolvency theory, "presented the most persuasive evidence regarding SolarCity's value and the fairness of the price Tesla paid to acquire it."[295] Musk's experts not only offered evidence demonstrating that SolarCity was not insolvent, but they also presented other evidence in order to prove the fairness of the price. And, as explained more fully below, market-based evidence was only one piece of Musk's fair price case. We now turn to the question of whether the trial court erred in finding that Musk had established the fairness of the price and whether the court erred in applying this aspect of the analysis.

### 2. *Musk's Evidence Adequately Supports the Trial Court's Finding of Fair Price*

#### a. *The Record Supports a Finding that Evercore's Fair Price Evidence Supports the Fairness of the Price*

As Tesla's financial advisor on the Acquisition, Evercore and its work were a focus at trial. Evercore's fairness opinion was based upon seven different valuation analyses,

---

[293] *Trial Op.*, 2022 WL 1237185, at \*40. *See also Dell*, 177 A.3d at 22 (observing that "it is possible that a factfinder, even the same factfinder, could reach different valuation conclusions on the same set of facts if presented differently at trial.").

[294] *Trial Op.*, 2022 WL 1237185, at \*48.

[295] *Id.* at \*40.

including DCF and non-DCF methodologies. In addition to the DCF analyses, Evercore's valuation methodologies, which were described in detail in its presentation to the Tesla Board, included a sum-of-the-parts ("SOTP") analysis and a premiums paid analysis.[296] Evercore credibly demonstrated to the court that the price paid was fair.

Appellants argue that the Court of Chancery committed legal error by disregarding the DCF evidence. Their position is that the Vice Chancellor refused to consider a DCF methodology.[297] Appellants also contend that the trial court's DCF analysis was inconsistent with several of its other findings. According to them, there are two issues. The first is that the trial court erred in relying on Evercore's fairness opinion, which was based, in part, on a DCF analysis they say was flawed.[298] The second is that the court ignored SolarCity's liabilities: as they frame it, "Tesla did not just pay $2.1 billion of stock, it *also* immediately assumed SolarCity's *$5.35 billion of liabilities*."[299] Musk argues

---

[296] *See* AR519–24 (Definitive Proxy at 77–82) (summarizing Evercore's financial analyses). At trial, McBean testified that Evercore's primary valuation methodologies were DCF, SOTP, and precedent premiums analysis. *See* A1688 (McBean Trial Test. at 1450:16–1451:18); A1689 (McBean Trial Test. at 1454:7–13). Appellants, in their post-trial briefing, described Evercore's two main valuation methodologies as the DCF and SOTP analyses.

[297] *See* Opening Br. at 52.

[298] Appellants criticize Evercore's DCF analysis for failing to account for the phasing out of an investment tax credit ("ITC") program. Fischel believed that there were no cash flows in the terminal period from the residential tax credit. *See* A1871 (Fischel Trial Test. at 2636:3–11). McBean testified that Evercore knew that the ITC program was ending, but it did not "make specific assumptions" about the ITC in its aggregate analysis of its DCF sensitivity case. A1687 (McBean Trial Test. at 1448:4–23). She also testified that Evercore's DCF analysis was consistent with the expected ITC phasedown, *see* A1687–88 (McBean Trial Test. at 1448:24–1449:2), and that Evercore did "extensive diligence" when it reached its conclusion that SolarCity would have other sources of cash available even with the end of the ITC program. *See* A1688 (McBean Trial Test. at 1449:10–20). Notably, Evercore's SOTP analysis took account of the ITC issue, as noted in the Definitive Proxy. *See* AR520 (Definitive Proxy at 78).

[299] Opening Br. at 54 (emphases in original).

that Appellants focus on the liabilities but ignore the $8.5 billion in assets Tesla acquired in the deal.

First, the trial court did consider the DCF analyses, except "neither expert [Quintero or Fischel] persuaded [the court] that a DCF analysis is the proper method by which to value SolarCity[.]"[300]  Quintero testified that a DCF was not the appropriate way to value SolarCity.  Fischel testified that he conducted a DCF as a check on the other market evidence, which he found to be more reliable.

Appellants assert that the trial court erred in finding that the DCF analyses were "not helpful," despite finding Evercore's analyses strong evidence of fair price.  Credibility findings explain, in part, the trial court's reliance on McBean and Evercore.  The court rejected the suggestion that Evercore's overall fairness opinion was unreliable, finding that "Evercore was a diligent advisor with no previous ties to Tesla, and McBean credibly explained and defended its work and advice."[301]  It also expressly found that "[t]he preponderance of the evidence reveals this opinion [by Evercore] was reliable, honest and

---

[300] *Trial Op.*, 2022 WL 1237185, at *41.  Quintero testified that a DCF analysis for SolarCity was "an unreliable valuation approach" and "highly speculative[.]"  A1580 (Quintero Trial Test. at 868:19–24).  Fischel testified that "the market evidence in this case is more probative, more reliable than an after-the-fact DCF analysis conducted by me or anybody else."  A1856 (Fischel Trial Test. at 2579:19–21).  *See also Rosenblatt*, 493 A.2d at 940 (observing "that the relative importance of the several tests of value depends upon the circumstances of each case.") (citing *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 115–16 (Del. 1952) (reasoning that net asset value was of less importance than earning power, given the nature of the assets of the two companies)).  Nor did the trial court here rely upon Fischel's stock indexing methodology, which the Court of Chancery had criticized in other decisions.  *See Trial Op.*, 2022 WL 1237185, at *44 n.509.

[301] *Id.* at *21 n.276.

85

independently given."[302]  The trial court found that Evercore's work was based upon "weeks of due diligence."[303]  The record supports this finding, as McBean testified at trial that "we did a tremendous amount of work on this transaction, thousands of hours with -- among our team.  It was a very thorough process.  This was probably one of the most involved diligence processes I've ever undergone."[304]

Further, at oral argument before this Court, when pressed as to this inconsistency point regarding the DCF analyses (*i.e.*, finding DCF analyses unhelpful, yet relying upon Evercore's analyses), Musk argued that the projections relied upon by Tesla's management were contemporaneous, as opposed to being litigation-driven analyses prepared by experts.[305]  The trial court concluded that "Evercore's analysis and projections were based

---

[302] *Id.*

[303] *Id.* at *46.

[304] A1733 (McBean Trial Test. at 1631:11–15).  She testified further that the Acquisition "was a great deal for Tesla, a strategic rationale which we believed in, and we stand behind our work." *Id.* (McBean Trial Test. at 1631:18–20).

[305] The following colloquy occurred:

> THE COURT:  How do you respond to Mr. Hanrahan's suggestion that there's some tension between the court's finding that the DCF analyses were not helpful and, yet, as part of its six factors that it looked at in fair price and finding the price to be fair, it looked at SolarCity's current and future cash flows?

> COUNSEL:  My answer is I think Mr. Hanrahan left one important fact out, which is the distinction between contemporaneous discounted cash flow analyses that were done at the company and the made-for-litigation discounted cash flow analyses, which the court did not credit.  That's the distinction.  Both sides came in with after-the-fact experts who did discounted cash flow analyses.  Mr. Quintero said, "I did it, but don't rely upon it and don't pay any attention to it."  Dr. Fischel did it and said, "I'm giving it to you.  I don't think these are particularly useful after the fact, but here it is if you want to consider it because the other side did one."  The court said, "I'm not considering those."  What the court considered was not the made-for-litigation DCFs but the contemporaneous DCFs, which the company was actually using to conduct its business.  Those, the court found, were relied upon by Evercore and were appropriate.

86

on 'extensive discussion and analysis' between Tesla and Evercore[.]"[306]

The record contains other quantitative analyses performed by Evercore. For example, McBean testified about Evercore's two SOTP analyses — another key component of Evercore's fairness opinion work. She stated that these analyses resulted in a range of $31 to $46 for the management case and a range of $16 to $26 for the revised sensitivity case.[307] She observed that "[t]he final deal price is below or within those ranges" and that "[s]pecifically, it's below the SolarCity management case and within the range for the revised sensitivity case."[308] We find no error in the trial court's determination that Evercore credibly explained and defended its work or in the trial court's overall reliance on Evercore's fairness opinion as "just one of many pieces of evidence that justify the price paid in the Acquisition."[309]

In addition to Evercore's fairness opinion, the trial court relied upon the contemporaneous KPMG analysis and the fact that Tesla booked an $89 million gain on the Acquisition.[310] As to Appellants' claim that the trial court ignored SolarCity's liabilities, the trial court's finding that SolarCity's "net assets [were] in excess of its market capitalization (as confirmed by KPMG)" and that it "brought substantial value to Tesla"

---

Oral Argument, at 40:50–41:59, https://livestream.com/delawaresupremecourt/events/10769099/videos/235611407:

[306] *Trial Op.*, 2022 WL 1237185, at *46 (internal citation omitted).

[307] A1689 (McBean Trial Test. at 1453:5–8).

[308] *Id.* (McBean Trial Test. at 1453:11–14).

[309] *Trial Op.*, 2022 WL 1237185, at *21 n.276.

[310] *See id.* at *41 n.481.

are supported by the record.[311]  The trial court found that, "as of closing, SolarCity had accumulated and continued to accumulate substantial net retained value."[312]  The trial court also relied upon cash flow and synergies analyses, which we discuss below.

### b.  The Trial Court did not err as to its Cash Flow Findings

Appellants argue that the Court of Chancery erred when it relied upon SolarCity's cash flows and upon "encumbered future cash flows that might never materialize."[313]  They contend that the Vice Chancellor relied upon "undocumented and unsupported testimony by Musk" that Tesla would realize $1 billion in nominal cash flows and at least $2 billion more from legacy SolarCity systems.[314]  They suggest a similar logical inconsistency,[315] namely, that the trial court considered cash flows, yet also stated that it would reject the discounted cash flow analyses prepared by the experts.  Musk responds that the cash flows represented "SolarCity's business model and part of the value proposition the Acquisition presented to Tesla" and that "the trial court found the cash flows supported by documentary evidence and credible testimony from five witnesses."[316]

The trial court found that "part of SolarCity's value came from the long-term cash flows it generated."[317]  It flows logically, then, that those cash flows are part of the "get"

---

[311] *Id.* at *24.

[312] *Id.*

[313] Opening Br. at 53.

[314] *Id.* at 53–54.

[315] *See supra* Section V.B.2.a.

[316] Answering Br. at 53–54 (internal citations omitted).

[317] *Trial Op.*, 2022 WL 1237185, at *45.  *See also supra* Sections I.D.2. and I.J.  *See also DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 349–50 (Del. 2017) ("It is, of course,

Tesla received from the Acquisition and factored into the fair price analysis. And, as the trial court's opinion demonstrates, the court did not solely rely upon Musk's testimony as to cash flows. Rather, the trial court considered evidence from Tesla's directors and from SolarCity's officers that cash flows were an integral part of SolarCity's business.[318] For example, the trial court noted that "[u]sing a 'retained value' methodology (calculating the net present value ('NPV') after accounting for the repayment of associated debt), SolarCity valued its future cash flows as of Q2 2016 at $2.2 billion (NPV) in retained value."[319] It found that "[t]his amount was available for monetization at the time of the Acquisition."[320] Further, the trial court found that "SolarCity's financing counterparties participated in financing transactions with SolarCity worth more than $3 billion from" the fourth quarter of 2015 through the fourth quarter of 2016.[321] We find no error in the trial court's

---

natural for all buyers to consider how likely a company's cash flows are to deliver sufficient value to pay back the company's creditors and provide a return on equity that justifies the high costs and risks of an acquisition.").

[318] *See Trial Op.*, 2022 WL 1237185, at *45 nn.524–26. For example, the Vice Chancellor pointed to Serra testifying "that the cumulative amount of cash flow would be $2.2 billion value today" and to Gracias testifying that it was "a very good deal for us, to pay 2-, $2-1/2 billion for a business that, on its face, was going to cash flow to us 3 billion off of leases alone." *Id.* at n.524 (internal quotation marks and citations omitted).

Van Zijl also testified that the cash flow stream "would probably be upwards of 3 billion" and was not encumbered but rather available for monetization. *Id.* (internal citation omitted).

[319] *Trial Op.*, 2022 WL 1237185, at *10 n.136 (internal citation omitted).

[320] *Id.*

[321] *Id.* at *17. Appellants argue that Bank of America — SolarCity's largest lender — repeatedly downgraded SolarCity's credit rating. Although that is true, those downgrades did not stop Bank of America from lending to SolarCity. In fact, the opposite occurred. As the trial court found, "[a]fter SolarCity's credit rating was downgraded, Bank of America (SolarCity's principal lender) reacted by *not only continuing to transact business with SolarCity but seeking to deepen the lender/borrower relationship*." *Id.* at *43 (emphasis added).

consideration of SolarCity's cash flows as supporting a finding of fair price.[322]

### c. The Trial Court's Synergy Findings Support Fair Price

Appellants contend that the trial court erred in relying on synergies as evidence of the fairness of the price. They argue that finding the Acquisition to be synergistic does not make the transaction entirely fair. But synergistic values are a relevant input for a court to consider in assessing the entire fairness of an acquisition. Potential synergies are often a prime motivator for an acquiring company.[323] That was the case here.[324] Following the trial, the Vice Chancellor found that "synergies were a focus of the Tesla Board from the very beginning of its consideration, and there is evidence to support them. At trial, numerous directors testified they were laser-focused on the potential synergies throughout

---

[322] The Vice Chancellor found that at "[t]he moment Tesla acquired SolarCity, it became the beneficiary of these cash flows. In fact, Tesla has already realized approximately $1 billion in nominal cash flows and expects to realize at least $2 billion more from the legacy SolarCity systems." *Id.* at *45.

[323] The same is true here: "the Tesla Board recognized the significant potential product synergies" at the first board meeting — on February 29, 2016 — where the possibility of a deal between Tesla and SolarCity was first raised. *Id.* at *12.

[324] The Definitive Proxy listed numerous reasons why Tesla believed the Acquisition was in the best interest of the company and its stockholders, with a focus on synergies. Among them: "its belief that the Combined Company will operate more efficiently to create fully integrated residential, commercial and grid-scale products[,] its expectation of substantial cost synergies[,] its expectation of substantial revenue synergies[, and] its belief that a combination of Tesla's and SolarCity's business could eliminate certain of the costs and complexities currently associated with transactions between Tesla and SolarCity[.]" AR513 (Definitive Proxy at 71).

In fact, the Definitive Proxy's first page specified the "strategic rationale" behind the Acquisition, informing stockholders that "Tesla and SolarCity believe that this is an opportune time to combine in order to operate more efficiently and fully integrate our products" and that "[t]he Combined Company is expected to achieve approximately $150 million in cost synergies in the first full year after closing[.]" AR443 (Definitive Proxy at 1).

90

the deal negotiations."[325]  Fischel testified that "standalone value is relevant, but synergies are also relevant [] in light of Tesla's objective of becoming an integrated, sustainable energy company[.]"[326]

We conclude that the Vice Chancellor properly found that the synergistic value in Tesla acquiring SolarCity could be "considered in assessing the value" of the Acquisition.[327]  The trial court credited Fischel's testimony that the relevant economic question is the value of the purchased assets to Tesla, and that synergies were a strong rationale for the Acquisition and, thus, were properly considered in assessing the value of SolarCity to Tesla.  We find no error in his determination, which is supported by the record evidence.[328]

Appellants also challenge the magnitude of the synergies, contending that the trial court further erred by crediting all potential cost, revenue, and global strategic synergies

---

[325] *Trial Op.*, 2022 WL 1237185, at *46.  For example, Denholm testified:

> I believed that it was in the best interests of Tesla shareholders to actually continue the mission of Tesla, which was to accelerate the world towards sustainable energy. And the best way to do that was to have the solar generation capability within the four walls of Tesla so that we could continue in terms of the technology journey that it would take to satisfy the mission, and I believed that it was in the best interests of all Tesla's shareholders.

*Id.* at *46 n.539.  Buss testified that Tesla got "this really good asset that was part of our long-term vision really at a great price[.]"  *Id.* (internal quotation marks omitted).  And Ehrenpreis testified that, following the Acquisition, Tesla became "a fully integrated, sustainable energy company and really the only one of its kind[.]"  *Id.*

[326] A1833 (Fischel Trial Test. at 2484:4–7).

[327] *Trial Op.*, 2022 WL 1237185, at *46.

[328] "It is the expectation of such synergies [*i.e.*, those to be created by the changes that the bidder contemplates] that allows a rational bidder to pay a premium when he negotiates an acquisition." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch. 1994) ("*Cinerama I*"), aff'd, *Cinerama II*, 663 A.2d 1156.

91

Tesla might eventually realize as elements of SolarCity's value. According to Appellants, these were "speculative synergies" that should not have factored into the fair price analysis. The trial court recognized that it should consider only cognizable synergies, not speculative synergies.[329] Fischel testified at trial that he pressure-checked Tesla's projection of $150 million in cost synergies per year.[330] These included "cost synergies that are described as various ways of reducing costs, including reducing headcount."[331] The Court of Chancery also noted that the synergies stemming from the Acquisition were known to Tesla stockholders:

> [P]rior to the close of the Acquisition, Tesla identified and disclosed to stockholders three categories of synergies that it expected to realize: (1) cost synergies (from "[s]ales and marketing efficiencies" and "corporate and overhead savings"); (2) revenue synergies (from leveraging Tesla's retail capabilities and the companies' overlapping customer bases); and (3) global strategic synergies (by creating the "world's only integrated sustainable energy company").[332]

Here, the potential synergies were estimated to be "at least $150 million per year," which the trial court found supported a finding of fair price.[333] The record supports these conclusions.

---

[329] *See Trial Op.*, 2022 WL 1237185, at *46.

[330] *See* A1846–47 (Fischel Trial Test. at 2539:12–2540:5). Evercore confirmed that $150 million in synergies was reasonable. *See Trial Op.*, 2022 WL 1237185, at *47 n.542.

[331] A1847 (Fischel Trial Test. at 2542:4–6).

[332] *Trial Op.*, 2022 WL 1237185, at *46 (internal citation omitted).

[333] *Id.* at *47.

*d. The Trial Court Properly Accorded Some Weight to the Stockholder Vote*

Appellants also contend that the Court of Chancery erred when it accorded weight to the stockholder vote on the Acquisition. They claim that "[a] coerced, uninformed vote by stockholders with conflicting equity interests is not even sufficient to change the standard of review, much less to prove fair price."[334] Musk responds that the court was free to consider the stockholder vote in evaluating the actual merits of these claims at trial and that the amount of weight accorded "is a classic example of trial court discretion[.]"[335] We agree.

In *Weinberger*, this Court expressly stated that the entire fairness standard "embraces questions [like] how the approvals of the directors *and the stockholders were obtained*."[336] And in *Cinerama II*, we found that "an overwhelming majority of" stockholders voting in favor of a transaction "constituted substantial evidence of fairness."[337] For the reasons we explained in Section IV.A.2. above, the trial court's finding — that the stockholder vote, wherein roughly 85% of Tesla stockholders approved the Acquisition, weighed in favor of fairness — was not erroneous.[338]

---

[334] Opening Br. at 55.

[335] Answering Br. at 56.

[336] 457 A.2d at 711 (emphasis added). *See also Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1182 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000).

[337] 663 A.2d at 1176. The Court of Chancery has also held that stockholder approval is an indicium of fairness. *See, e.g., ACP Master*, 2017 WL 3421142, at *29 ("[A]pproval of the merger at $5.00 per share by a supermajority of Clearwire's minority stockholders is compelling evidence that the price was fair.").

[338] As we noted there, the Vice Chancellor gave the stockholder vote less weight than he otherwise may have due to Appellants' disclosure contentions and the crossholdings point. *See also Trial*

### e. *Some, but not all, Market Evidence Supports Fair Price*

As evident from the preceding discussion, and from the trial court's direct statement that Evercore's fairness opinion was "one of many pieces of evidence" that justified the price, only part of Musk's evidence on fair price focused on market evidence. And even within the trial court's discussion on market evidence, the June 21 stock price was not the sole aspect considered — it was one of three aspects of market evidence. The other two included the fact that the market for SolarCity was efficient (which neither side disputed)[339] and that the stockholders overwhelmingly voted for the Acquisition.[340] Our review of the record reveals no error by the Vice Chancellor in his consideration of these aspects of Musk's market evidence as supporting a finding of fair price.

As for the efficiency of the market, experts for both Appellants and Musk testified that SolarCity traded in an efficient market, leading the Vice Chancellor to conclude the

---

*Op.*, 2022 WL 1237185, at *36 n.430. We also note that the stockholder vote is but one component of the trial court's fair price analysis. *See id.* at *44–45.

[339] Fischel testified, for example, that throughout 2016, Tesla's stock price reflected all publicly available information and would react quickly and without bias to all newly disclosed, value-relevant information. *See* A1866 (Fischel Trial Test. at 2618:13–19). He observed that "[t]hat's the general definition of 'semi-strong efficient markets.'" *Id.* (Fischel Trial Test. at 2618:22–23).

[340] *See Trial Op.*, 2022 WL 1237185, at *42–45. Fischel explained at trial how he concluded that both SolarCity and Tesla stock traded in an efficient market:

> [T]hey're both actively traded on NASDAQ. They're actively followed by analysts. Prices reacted quickly to information. Basically, all the traditional indicia of trading in an efficient market really was satisfied by the stocks of both companies.

A1834 (Fischel Trial Test. at 2490:1–6). He observed that there was "[m]assive scrutiny" of SolarCity's economic position by analysts and "voluminous discussion of SolarCity's liquidity position" in the market commentary. A1834–35 (Fischel Trial Test. at 2490:10; 2494:9–10).

94

same.[341] The trial court found, for example, "that SolarCity accurately disclosed the existence and terms of its debt covenants, that its covenant compliance margins decreased in Q1 and Q2 of 2016, the potential consequences of a breach, its quarterly cash balances and its debt maturities."[342] It found that Appellants' experts "conceded that market participants were aware of the risk that SolarCity might breach its Liquidity Covenant."[343] Further, "[t]he unrebutted trial evidence establishe[d] that SolarCity appropriately and timely disclosed guidance reductions consistent with its internal projections."[344] Finally, as we held above, given the credible evidence presented at trial, SolarCity's failure to disclose information related to its credit downgrades was immaterial. The record supports these conclusions.[345]

As for the second piece of Musk's market evidence, the Vice Chancellor found the stockholder vote to be credible evidence of fairness.[346] As to the court's consideration of

---

[341] *See Trial Op.*, 2022 WL 1237185, at *42. Trading in an efficient market means that the market quickly assimilates all publicly available information into a company's stock price. *See Fir Tree Value Master Fund, LP v. Jarden Corp.*, 236 A.3d 313, 326 (Del. 2020); *see also Dell*, 177 A.3d at 16 (observing that the efficient market hypothesis teaches that the price of a company's stock reflects all publicly available information).

Evidence of a stock's trading price in "an efficient market is generally a more reliable assessment of fair value than the view of a single analyst, especially an expert witness who caters her valuation to the litigation imperatives of a well-heeled client." *Id.* at 24.

Conversely, "reliance on a price determined in a thinly traded, illiquid, market is evidence of a price's unfairness." *Gesoff*, 902 A.2d at 1154.

[342] *Trial Op.*, 2022 WL 1237185, at *42.

[343] *Id.*

[344] *Id.*

[345] McBean, in addition to Fischel, testified that, as of the time of the stockholder vote, the market knew about SolarCity's liquidity situation. *See* A1732 (McBean Trial Test. at 1626:17–20).

[346] *See also supra* Section IV.A.2 (discussing how the stockholder vote indicates fair dealing).

this market-based evidence, we find no error. Market evidence, in fact, is one of the explicit factors we first listed in *Weinberger* for determining if a price paid was fair: the price "aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors [including] *market value*[.]"[347]

*3. The Trial Court Erred in its Analysis of the June 21 Stock Price*

Lastly, we turn to the third aspect of market evidence and to Appellants' argument that "the trial court erred by rote reliance on market price."[348] They contend that affirmance by this Court would reduce the entire fairness analysis to the single question of whether the purchase price is sufficiently near the unaffected stock price.[349] Appellants argue that "[t]he trial court did not determine SolarCity's value *on November 21, 2016*, as it was required to do, because it based its fair price holding on what it claimed was 'market evidence,' specifically SolarCity's June 21, 2016 stock price."[350] They say that the Vice Chancellor looked to the trading price of $21.19 per share for SolarCity's stock on June 21, the day Tesla announced the Acquisition and then compared that trading price to the ultimate exchange ratio for the Acquisition, which implied a $20.35 per share price. This, they argue, led the court to conclude erroneously that this was "a discount of 84 cents per

---

[347] 457 A.2d at 711 (emphasis added).

[348] Opening Br. at ii, 45.

[349] The *amici* similarly urge that "[i]f a conflicted party can rely on little more than the pre-announcement transaction price to demonstrate the fairness in question, the party has little to gain from submitting to the procedural protections in *MFW*." Amicus Br. at 21. *See also id.* at 4 ("The Court of Chancery's approach, thus, threatens to fatally undermine *MFW* by substantially negating the incentives *MFW* promotes.").

[350] Opening Br. at 48 (emphasis in original).

share" and that "Tesla paid no premium for SolarCity as of closing."[351]

In arguing that the June 21 stock price could not be trusted as a proxy for value, they point to certain pieces of information regarding SolarCity that were not known to the market as of June 21 but became known later during the summer and fall. The information they point to consists of two items, namely, SolarCity's liquidity problems and SolarCity's credit downgrades. As the trial court noted, neither was known to the Tesla Board when the Acquisition was first announced in June. The Tesla Board only learned of SolarCity's liquidity problems on July 19, when Evercore presented on SolarCity's direct liquidity situation and explained that SolarCity could trip its Liquidity Covenant by July 30, 2016. The Vice Chancellor credited the "new developments and concerns" uncovered by Evercore during the summer of 2016, which the court found were "used to lower the price substantially[.]"[352] Further, Evercore acknowledged that SolarCity's stock did not reflect non-public information Evercore discovered in due diligence.[353] The Vice Chancellor also found that SolarCity failed to disclose information related to its credit downgrades during negotiations.[354] This information, according to Appellants, was not factored into the stock

---

[351] *Id.* at 48–49 (quoting *Trial Op.*, 2022 WL 1237185, at *43).

[352] *Trial Op.*, 2022 WL 1237185, at *37 (internal citation omitted).

[353] At trial, Evercore's McBean testified: "The market had certain information. We had additional information, having done nonpublic diligence. So the market had some information about the liquidity situation of SolarCity, but not complete information." A1704 (McBean Trial Test. at 1515:8–12). She further testified that there would typically be a decrease in stock price for SolarCity if the public knew that the company would trip its Liquidity Covenant. *See* A1714 (McBean Trial Test. at 1553:24–1554:1).

[354] *Trial Op.*, 2022 WL 1237185, at *43 (holding that the failure to disclose this information, however, was immaterial).

97

price relied upon by the Vice Chancellor. We focus mainly on the "liquidity information" issue, as we have already found no error in the trial court's determination that the credit downgrades were immaterial.

Appellants' criticism of the court's reliance on the June 21 stock price has some merit for two reasons. First, the trial court never explained why it was reasonable to rely on the June 21 stock price in the face of the nonpublic information it identified as not being available in June.[355] This is an error in its analysis. Second, the court did not explain, at least in a general sense, the weight it gave to the June 21 stock price.

As to the weighting issue, in *DFC*, in the appraisal context, we emphasized that the Court of Chancery should explain its weighing of indications of value in a manner that is grounded in the record.[356] We acknowledge that specific weighting of valuation methodologies takes on more significance in the appraisal context, where the court is

---

[355] We note, however, that the Vice Chancellor did provide a reason for why he specifically selected June 21. After looking at the evidence, including various analyst reports and testimony by Fischel and McBean, which set the unaffected trading price date as June 21, 2016, the Vice Chancellor noted that he was "likewise persuaded that the June date is the appropriate date upon which to set SolarCity's unaffected stock price." *Id.* at *43 n.504.

[356] *See DFC*, 172 A.3d at 388. In *DFC*, this Court stated that:

> [T]he Court of Chancery must exercise its considerable discretion while also explaining, with reference to the economic facts before it and corporate finance principles, why it is according a certain weight to a certain indicator of value. In some cases, it may be that a single valuation metric is the most reliable evidence of fair value and that giving weight to another factor will do nothing but distort that best estimate . . . . What is necessary in any particular case though is for the Court of Chancery to explain its weighting in a manner that is grounded in the record before it.

*Id.*

required to derive a single numerical estimate of fair value.[357]  In entire fairness cases, the court's analysis — although no less rigorous — is less aimed at deriving a specific fair value amount than at a range of values, where the price is deemed to be fair.  "A court could conclude that a price fell within a range of fairness and would not support fiduciary liability, yet still find that the point calculation demanded by the appraisal statute yields an award in excess of the merger price."[358]  As we said in *Cinerama II*, "[t]he standard of entire fairness is also not in the nature of a litmus that 'lend[s] itself to bright line precision or rigid doctrine.'"[359]  "Rather, it is a standard by which the Court of Chancery must carefully analyze the factual circumstances, apply a disciplined balancing test to its findings, and articulate the bases upon which it decides the ultimate question of entire fairness."[360]

Notwithstanding that the analysis, as well as the court's function, in appraisal cases is different,[361] it is helpful to the reviewing court for the trial court to provide a general sense of how it weighed the valuation methodologies and fair price evidence.  In the absence of this information, Appellants speculate that the trial court solely relied on the June 21 stock price.  Although this argument is refuted, in our view, by the opinion itself, the litigants and our Court would have been greatly aided by a more fulsome discussion of

[357] Pursuant to 8 *Del. C.* § 262, the Court of Chancery assesses the company's fair value as of "the effective date of the merger[.]"  8 *Del. C.* § 262(h).

[358] *In re Trados*, 73 A.3d at 78.

[359] 663 A.2d at 1179 (quoting *Nixon*, 626 A.2d at 1381).

[360] *Id.* at 1179.

[361] *See infra* note 257.

how the trial court weighed the valuation evidence.

Although this is a buy-side alleged overpayment case and not an appraisal case, *Verition Partners Master Fund Ltd. v. Aruba Networks, Inc.*,[362] a statutory appraisal case, highlights the other problematic aspect of reliance on the June 21 price, namely the fact that it did not take account of the depth of the liquidity issues.[363] The trial court in *Aruba* had looked to market price as a measure of the fair value of the corporation, but it relied upon an outdated, unaffected market price that did not factor in certain material, nonpublic information. There, Hewlett-Packard Company ("HP") approached Aruba Networks, Inc. ("Aruba") about a possible combination. Negotiations between the two ensued and, eventually, HP submitted a bid, which Aruba accepted. The problem, however, was that HP knew about Aruba's strong quarterly results long before those results were disclosed to the market. But the *Aruba* trial court failed to factor that into its analysis of Aruba's fair value, instead holding that Aruba's thirty-day unaffected market price represented Aruba's fair value.

We reversed and explained that our decisions in *Dell* and *DFC* did not "compel" any reliance on market price as the sole indicator of fair value. The issue in *Aruba* was that HP had access to nonpublic information that the market did not factor in, thus giving HP an advantage. As we explained:

> Under the semi-strong form of the efficient capital markets hypothesis, the unaffected market price is *not assumed to factor in nonpublic information*. In this case, however, HP had signed a confidentiality agreement, done

---

[362] 210 A.3d 128 (Del. 2019).

[363] Musk does not cite *Aruba* in his papers before this Court.

exclusive due diligence, *gotten access to material nonpublic* information, and had a much sharper incentive to engage in price discovery than an ordinary trader because it was seeking to acquire all shares.[364]

We reversed because the Court of Chancery in *Aruba* placed sole reliance on the unaffected market price, but that "unaffected market price was a measurement *from three to four months prior to the valuation date*, a time period during which it is possible for new, material information relevant to a company's future earnings to emerge."[365]

Our discussion in *Aruba* should have cautioned against reliance on a stock price that did not account for material, nonpublic information, especially where the trial court has expressly found that certain information had not been factored into that stock price. Although *Aruba* reveals the flaw in that aspect of the trial court's analysis, it does not undermine the trial court's overall fair price finding for several reasons.

First, the other evidence — which the trial court found to be credible and persuasive — amply supports the court's finding that the price was fair. Musk presented an array of valuation and fair price evidence, and the trial court found that he "presented the most persuasive evidence regarding SolarCity's value and the fairness of the price Tesla paid to acquire it[,]"[366] including Evercore's fairness opinion and its supporting analyses. As the trial court stated, "Evercore's fairness opinion is just one of the many pieces of evidence that justify the price paid in the Acquisition."[367] And as the court found, "there [was] no

---

[364] *Aruba*, 210 A.3d at 140 (emphases added).

[365] *Id.* at 139 (emphasis added). We observed, for example, that HP had material, nonpublic information that "could not have been baked into the public trading price." *Id.* at 139.

[366] *Trial Op.*, 2022 WL 1237185, at *40.

[367] *Id.* at *21 n.276.

101

reason to doubt Evercore in this case."[368]  Although Appellants argue that Fischel was Musk's lead financial expert and that Musk, on appeal, is "switching horses" by relying more on Evercore, the Vice Chancellor carefully evaluated all of the evidence and accepted some of it, and rejected other aspects of it.  There can be no doubt that Evercore, as Tesla's financial advisor for the Acquisition, played a key role in both the overall Acquisition process and at trial.

"When faced with differing methodologies or opinions the [trial] court is entitled to draw its own conclusions from the evidence."[369]  Further, "[s]o long as the court's ultimate determination of value is based on the application of recognized valuation standards, its acceptance of one expert's opinion, to the exclusion of another, will not be disturbed."[370]  Here, the court relied on Evercore's fairness opinion analyses and portions of Fischel's analyses, and rejected Quintero's analysis altogether.  It expressly rejected the claim that Evercore's opinion "was unreliable"[371] and found that "the Acquisition price fell within or below each of the seven stock price ranges Evercore presented to the Tesla Board (plus two illustrative reference ranges)."[372]

In addition to Evercore's DCF and SOTP analyses, which are based upon recognized valuation standards, SolarCity's current and future cash flows, the substantial

---

[368] *Id.* at *46.

[369] *Lynch II*, 669 A.2d at 87.

[370] *Id.* at 87–88.

[371] *Trial Op.*, 2022 WL 1237185, at *21 n.276 (internal quotation marks and citation omitted).

[372] *Id.* at *21.

102

synergies flowing to Tesla from the Acquisition, the other aspects of market evidence, including the stockholder vote, and the evidence of SolarCity's solvency, including the KPMG analysis and related retained value analyses, also support the trial court's finding of fair price.[373]

And with the rejection of Appellants' lone insolvency valuation theory, there was no credible countervailing evidence.[374] The Court of Chancery, after examining all of the expert testimony and fair price evidence, found that the fair price case was not even close.[375] Thus, even without the June 21 price, there is ample support in the record to support the fairness of the price.

## VI. UNITARY FAIRNESS ANALYSIS

Finally, having gone through the fair dealing and fair price analyses of the entire fairness test, we address whether, under the unitary application of the test, Musk proved entire fairness. In *Weinberger*, this Court stated that "the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."[376] Since then, we have recognized that the

---

[373] *See id.* at *40.

[374] *See supra* Section V.B.1. *See also infra* note 293.

[375] *See Trial Op.*, 2022 WL 1237185, at *48 ("I have no credible basis in the evidence to conclude that a 'fairer price' was available, and therefore, no basis to conclude that the price paid was not entirely fair. Indeed, the price was, in my view, not 'near the low end of a range of fairness,' but '*entirely*' fair in the truest sense of the word.") (emphasis in original) (internal citations omitted).

[376] 457 A.2d at 711. *See also Lynch II*, 669 A.2d at 84 ("An important teaching of *Weinberger*, however, is that the test is not bifurcated or compartmentalized but one requiring an examination of all aspects of the transaction to gain a sense of whether the deal in its entirety is fair."); *Encite LLC v. Soni*, 2011 WL 5920896, at *20 (Del. Ch. Nov. 28, 2011) ("Although fair dealing and fair

entire fairness test is a "unitary standard."[377]  The Court of Chancery has succinctly

summarized why the unitary determination of the test is so important:  "[a] strong record

of fair dealing can influence the fair price inquiry, *reinforcing the unitary nature of the*

*entire fairness test.*  The converse is equally true:  process can infect price."[378]

Although the Vice Chancellor concluded that the Acquisition, on a unitary basis,

was entirely fair, he did not set forth that analysis in a separate section.  We are,

nevertheless, satisfied that the court evaluated the effect the process flaws had on the

overall fairness of the process and the Acquisition.  For example, the court concluded that:

> With the Tesla Board's deal process front of mind, and after careful
> consideration, for the reasons just explained, [Musk's] compelling "evidence
> on price fairness was ultimately persuasive," such that I can conclude the
> Acquisition was entirely fair.[379]

Although some of this analysis is in lengthy footnotes — like the one quoted above — it is

there.  For example, the Court of Chancery recognized that "[i]n instances where there are

process infirmities, the Court is obliged to study fair price even more carefully."[380]  At the

beginning of his analysis, the Vice Chancellor stated:

> I explain my finding that [Musk] has proven the Acquisition was entirely fair
> and, therefore, he did not breach his fiduciary duties.  The evidence adduced
> at trial proved the Acquisition process, like most worldly things, had both
> flaws and redeeming qualities.  The linchpin of this case, though, is that

price concern separate lines of inquiry, the determination of entire fairness is not a bifurcated
analysis.").

[377] *Tremont*, 694 A.2d at 432.  *See also Basho Techs.*, 2018 WL 3326693, at *40 (addressing the
unitary determination of fairness); *In re Dole Food*, 2015 WL 5052214, at *37–38 (same); *In re
Trados*, 73 A.3d at 76 (same).

[378] *Reis*, 28 A.3d at 467 (emphasis added).

[379] *Trial Op.*, 2022 WL 1237185, at *48 n.555 (quoting *In re Trados*, 73 A.3d at 66).

[380] *Id.* at *48.

[Musk] proved that the price Tesla paid for SolarCity was fair—and a patently fair price ultimately carries the day.[381]

There can be no dispute that the trial court weighed both fair dealing and fair price and found that Musk proved his case. The record demonstrates that the negotiations were conducted at arm's-length, in good faith, with the advice of independent financial and legal advisors, led by an indisputably independent director, and, thus, constituted a fair process that led to a fair price.[382] But the trial court's opinion could have been aided by separately and expressly setting forth its process and price conclusions and by identifying its unitary determination of entire fairness in a separate section at the end.

In sum, although, as we have highlighted, there was an error in the trial court's fair price analysis, and we have suggested how the presentation of its findings could have been more helpful, there is no reversible error.[383] We are convinced that the record supports the conclusion that the Acquisition was entirely fair. The trial court's opinion is replete with factual findings and credibility determinations, and those determinations have not been challenged and decidedly weigh in favor of Musk. Neither the Vice Chancellor nor this Court applauds the process here as pitch perfect. But it does not have to be. The question

---

[381] *Id.* at \*27.

[382] *See Cinerama I*, 663 A.2d at 1144 (despite a flawed process, the transaction was fair where "the board was insufficiently informed to make a judgment worthy of presumptive deference, nevertheless considering the whole course of events, including the process that was followed, the price that was achieved and the honest motivation of the board to achieve the most financially beneficial transaction available").

[383] *See Cinerama II*, 663 A.2d at 1179 ("A finding of perfection is not a *sine qua non* in an entire fairness analysis" because "perfection is not possible, or expected as a condition precedent to a judicial determination of entire fairness.") (internal quotation marks and citation omitted).

is whether the Acquisition was entirely fair.  We agree with the Vice Chancellor that it was.

*VII.     CONCLUSION*

For the reasons set forth above, we AFFIRM the Court of Chancery's opinion.